John DUDA, Plaintiff–Appellant,

v.

BOARD OF EDUCATION OF FRANKLIN PARK PUBLIC SCHOOL DISTRICT NO. 84, John Barry, Dan Pietrini, et al., Defendants–Appellees.

No. 97–2457.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1997.

Decided Jan. 16, 1998.

Margo L. Ely (argued), Oak Brook, IL, for Plaintiff–Appellant.

Michael A. Warner, Jr. (argued), Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Defendants–Appellees.

Before WOOD, JR., RIPPLE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

John Duda filed a complaint against his employer, the Board of Education of Franklin Park Public School District No. 84 ("School District"), and certain administrative and custodial employees of the School District. The complaint alleged violations of the Americans with Disabilities Act ("ADA") and, pursuant to 42 U.S.C. § 1983, violations of his constitutional right to privacy. The district court granted the defendants' motion to dismiss the complaint. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings.

I

BACKGROUND

A. *The Allegations of the Complaint*

This case is before the court on appeal from the district court's grant of judgment on the pleadings. *See* Fed.R.Civ.P. 12(b)(6). In reviewing the district court's ruling, therefore, we must take the allegations in the pleadings as true.

Prior to this litigation, John Duda had been a night custodian at the junior high school for eight years. The defendants knew that he had been diagnosed by a psychiatrist as a manic depressive with bipolar disorder and as a recovering alcoholic; they knew as well that he took medication to stabilize his depressive condition. On his work breaks, when Mr. Duda felt anxious or depressed, he often would write private thoughts in his diary. One night his coworkers on the custodial staff seized the diary and read his personal thoughts. Then they copied pages of the diary and gave them to the junior high school principal and other administrators and coworkers.[1] When the School District offi-

---

1. At a status hearing on February 12, 1997, counsel for the School District told the district court that Mr. Duda's diary contained a death threat against Mr. Duda's supervisor. This factu-

cials read Mr. Duda's diary, they told him to leave the school premises until he received a "clean bill of health" from his doctor. That same day Mr. Duda saw his psychiatrist and obtained a note from him indicating that he was stable and could return to work. When the school officials required further independent psychiatric evaluation, Mr. Duda submitted the evaluations of two other psychiatrists indicating that he was stable, could return to work and was no danger to anyone.

The defendants imposed other conditions on Mr. Duda before allowing him to return to work: He was required to continue attending Alcoholic's Anonymous and counseling and to keep taking his medication; moreover, he was to notify the Superintendent of the School District if any changes were made in his medication or counseling. In addition, the School District demanded that he refrain from all discussion about his diary with coworkers. Before he returned to work, Mr. Duda also was told that it would be tense and uncomfortable for him to return to the junior high school with his coworkers there. He was strongly encouraged to transfer to another school at which he would work alone. When he did transfer to the elementary school with no other custodians, Mr. Duda was told not to have conversations with others at the school. Finally, when he expressed an interest in applying for a better position, a bus driver/custodian opening, he was told not to apply because of the incident involving the diary.

Mr. Duda claims that the ADA was violated because the School District segregated him from others at the school and told him not to apply for the bus driver job. In addition, Mr. Duda brought claims under 42 U.S.C. § 1983, alleging that his constitutional rights were violated by the unreasonable search and seizure of his diary and the invasion of his privacy by the reading of his diary. He also alleged supplemental state claims grounded in the same actions of the defendants.

## B. *The Decision of the District Court*

The defendants filed a motion to dismiss the complaint or, in the alternative, to strike the claim for punitive damages. The district court ordered Mr. Duda to answer that motion. Instead of answering the pending motion, however, Mr. Duda filed a first amended complaint and a motion for leave to file it. The district court denied the motion to file the amended complaint, struck the amended complaint and gave Mr. Duda an additional 15 days in which to reply to the pending motion to dismiss. Mr. Duda then replied to the motion to dismiss. Notably, although he addressed the substance of the motion, he also requested specifically that the court grant him leave to amend the complaint if the court were to determine that the allegations in the initial complaint were insufficient. The district court granted the motion to dismiss the complaint. It did not address specifically the issue of the amended complaint in its order.

Focusing exclusively on the initial complaint, the district court held that Mr. Duda had failed to state a claim under the ADA. The court turned to the § 1983 charges Mr. Duda raised and found them legally infirm on several grounds. The action was then dismissed in its entirety.

## II

## DISCUSSION

### A. *Denial of Leave to Amend the Complaint*

 Rule 15(a) of the Federal Rules of Civil Procedure gives a plaintiff the right to amend his complaint before a responsive pleading is served. The rule clearly provides that a plaintiff "may amend his pleading once as a matter of course at any time before a responsive pleading is served." A responsive

---

al allegation was not contained in the complaint. Nevertheless, the district court included the information in its memorandum opinion of May 14, 1997, in which it dismissed Mr. Duda's complaint. When a district court dismisses a complaint under Rule 12(b)(6), as this court did, it

must not look to materials beyond the pleading itself. *See Alioto v. Marshall Field's & .Co.*, 77 F.3d 934, 936 (7th Cir.1996). If extrinsic materials are considered, the motion must be converted into one for summary judgment. *Id.*

pleading[2] does not include a motion to dismiss. *See Camp v. Gregory*, 67 F.3d 1286, 1289 (7th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 2498, 135 L.Ed.2d 190 (1996).[3] Once an amended pleading is filed, it supersedes the prior pleading. *See Wellness Community–National v. Wellness House*, 70 F.3d 46, 49 (7th Cir.1995); *Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir.1994). "The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading, and becomes functus officio." *Fuhrer v. Fuhrer*, 292 F.2d 140, 144 (7th Cir.1961).[4]

■ Here, although a responsive pleading had not been filed, the district court denied Mr. Duda's request for leave to amend the complaint and struck the amended complaint without making, as far as the record reflects, an independent assessment of its merits. This action was contrary to well established law. The amended complaint became, upon its submission, the operative complaint in the case; the original filing no longer controlled the litigation. The district court's assessment of that original pleading therefore cannot control the disposition of the defendants' motion.

Rather than simply reverse the judgment and remand the case to the district court, considerations of judicial economy counsel that we scrutinize the amended complaint at this stage of the proceedings and determine its viability. The standards that must guide our inquiry are well established. In evaluating the sufficiency of the amended complaint, we must take the allegations stated in that document as true and must sustain that complaint if any facts that might be established within those allegations would permit a judgment for the plaintiff. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In assessing the averments of a complaint, we must remember, moreover, that the Federal Rules of Civil Procedure are based on the concept of notice pleading. It is sufficient if the complaint adequately notifies the defendants of the nature of the cause of action. *Id.* at 48, 78 S.Ct. at 103. As the Supreme Court has recently reminded us, the Federal Rules of Civil Procedure do not permit us to demand a greater level of specificity except in those instances in which the Rules specifically provide for more detailed elaboration. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). We emphasize that our task here is to pass on the adequacy of the amended complaint. We need not rule—and specifi-

---

**2.** In Moore's treatise on federal practice, "responsive pleading" is discussed in relation to Rule 15(a):

> The term *responsive pleading* is defined by reference to Rule 7(a), which distinguishes between pleadings and motions, and provides an exclusive list of what is a pleading: a complaint, an answer, a reply to a counterclaim, an answer to a crossclaim, a third party complaint, and an answer.
>
> Pre-trial motions attacking the pleadings or seeking relief as to collateral matters are not responsive pleadings. Accordingly, if no responsive pleading has been filed, the filing of these motions does not cut off a plaintiff's right to amend as a matter of course. Examples of pre-trial motions include: Motions to dismiss[,] Motions for summary judgment[,] Motions for a more definite statement under Rule 12[,] Motions for production and inspection[,] Motions to quash service.

3 James Wm. Moore et al., Moore's Federal Practice ¶ 15.11 (3d ed.1997) (footnotes omitted).

**3.** *See also Leaf v. Supreme Court of State of Wis.*, 979 F.2d 589, 595 (7th Cir.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993); *Fuhrer v. Fuhrer*, 292 F.2d 140, 142 (7th Cir.1961) (citing *Peterson Steels, Inc. v. Seidmon*, 188 F.2d 193 (7th Cir.1951)).

**4.** Although our case law has termed the preresponsive-pleading right to amend the initial complaint "absolute," *see Peckham v. Scanlon*, 241 F.2d 761, 764 (7th Cir.1957) (noting the "absolute right" to amend as recognized in *Peterson Steels*, 188 F.2d at 194), our case law acknowledges one exception to the right to amend the complaint once before the filing of a responsive pleading. We have held that a district court need not permit the filing of an amended complaint, even when no responsive pleading has been filed, when examination of the proposed complaint makes clear that it does not cure the deficiencies of the original pleading and the amended complaint is doomed not to survive a motion to dismiss. *See Mitchell v. Collagen Corp.*, 67 F.3d 1268, 1273–74 (7th Cir.1995), *vacated on other grounds,* — U.S. ——, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996); *Perkins v. Silverstein*, 939 F.2d 463, 472 (7th Cir.1991). "To hold otherwise would impose upon the defendants and the courts the arduous task of responding to an obviously futile gesture on the part of the plaintiffs." *Perkins*, 939 F.2d at 472.

cally do not rule—on the correctness of the district court's perceptions of inadequacy in the initial pleading. With these principles in mind, we now turn to an examination of the amended complaint.

## B. *The ADA Allegations*

We turn first to Count I of the amended complaint; it alleges a violation of the ADA.

### 1.

The Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101–213, provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The federal legislation, which took effect in July 1992, prohibits an employer's discrimination "against a qualified individual with a disability because of the disability of such individual in regard to ... [the] terms, conditions, and privileges of employment." § 12112(a). To determine whether Mr. Duda is qualified to bring a claim under the ADA, we turn to the various pertinent statutory definitions. First, there must be a disability. The Act offers three definitions by which one could establish the existence of a disability:

(A) a physical or mental impairment that substantially limits [5] one or more of the major life activities [6] of such individual;

(B) a record of such impairment[7]; or

(C) being regarded as having such impairment.[8]

*Id.* at § 12102(2). The regulations explicating and interpreting the statute define a "mental impairment" as "[a]ny mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

To fall under the protection of the ADA, an employee not only must be disabled but also must be a "qualified individual with a disability." To be "qualified," the ADA requires that he be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment condition that such individual holds or desires." *Id.* at § 12111(8). The regulations present two prongs to the definition of "qualified individual." First, the disabled individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position [he] holds or desires." 29 C.F.R. § 1630.2(m). Second, he "can perform the essential functions of such position" with or without accommodation. *Id.*

> The purpose of this second step is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because they are not able to perform [sic] marginal functions of the position.

---

5. An impairment qualifies as substantially limiting a person when he, as compared to the general population, is "[u]nable to perform a major life activity" or is "[s]ignificantly restricted as to the condition, manner or duration under which" he can perform that major life activity. 29 C.F.R. § 1630.2(j). The regulations offer factors to consider when assessing whether an impairment is substantially limiting: (1) its nature and severity; (2) its duration or expected duration; and (3) its permanent or long term impact or its expected impact. *See* § 1630.2(j)(2).

6. "Major life activities" include such basic functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

7. A person is "disabled" under this definition if he "has a history of, or has been misclassified as having, a mental or physical impairment that

substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). In the Appendix to Part 1630, the Equal Employment Opportunity Commission ("EEOC") has offered interpretative guidance to the ADA. It states that the intent of this "record" definition of "disability" is "to ensure that people are not discriminated against because of a history of disability" or "because they have been misclassified as disabled." 29 C.F.R. Pt. 1630, App. § 1630.2(k) (1997).

8. An individual may be "regarded as disabled" under this last definition of "disability" in any of three ways. His impairment (1) "does not substantially limit major life activities but is treated ... as constituting such limitation;" (2) "substantially limits major life activities only as a result of the attitudes of others toward such impairment;" or (3) is not defined by the regulations, but the individual nevertheless "is treated by [his employer] as having a substantially limiting impairment." 29 C.F.R. § 1630.2(*l* ).

29 C.F.R. Pt. 1630, App. § 1630.2(m) (1997). When a plaintiff satisfies both steps in this definition, he is a "qualified individual with a disability." That determination should be based on the qualified disabled individual's capabilities at the time of the employment decision. *Id.* It "should not be based on speculation that the employee may become unable in the future or may cause increased health insurance premiums or workers compensation costs." *Id.*

## 2.

■ To prevail in his ADA claim, therefore, Mr. Duda must satisfy the threshold requirement of demonstrating that he is a "qualified individual with a disability" under the ADA. In Count I of the amended complaint, Mr. Duda states quite plainly that he suffers from a psychiatric illness and has been diagnosed as a manic depressive. He alleges that the School District is aware of that diagnosis and that it regards him as disabled and substantially limited in major life activities. He further alleges that, because of that perception on the part of the District, it has determined that he is unable to work with others, to get along with co-workers and to communicate with other people. Consequently, it has segregated him in his transfer to the elementary school, where he is forced to work alone under orders not to communicate with any other individual.

Mr. Duda sufficiently alleged a "disability" in his amended complaint. Our cases have distinguished between claims of personal conflicts with others, or mere temperament and irritability, which do not amount to "disabilities" under the ADA,[9] and medically diagnosed mental conditions, like the ones from which Mr. Duda suffers, which are recognized disabilities under the ADA.[10]

■ Mr. Duda also adequately alleges that he can perform the essential functions of his job. Moreover, his allegation that he was forced to transfer to a new location and to work alone, under orders not to speak to others, is a clear claim of forced reassignment or of an unreasonable accommodation by the School District based on its regard of his disability. The ADA statute includes "segregating" a job applicant among its definitions of "discrimination." *See* 42 U.S.C. § 12112(b)(1).[11] The EEOC's interpretive

---

9. *See, e.g., Palmer v. Circuit Ct. of Cook County,* 117 F.3d 351, 352 (7th Cir.1997) (noting that "a personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law, even if it produces anxiety and depression, as such conflicts often do") (citation omitted); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996) (concluding that plaintiff's claimed "disability," the stress and anxiety caused by her supervisor, is not recognized as a disability under the ADA and that her major life activity of working was not "substantially limited" if she merely cannot work under that particular supervisor); *Stewart v. County of Brown,* 86 F.3d 107, 111 (7th Cir.1996) (concluding that Sheriff's order of psychological evaluations and conclusion that plaintiff was temperamentally unfit to serve as a sheriff's deputy "do not amount to a showing even of a perception of a mental impairment that substantially limits one or more of the major life activities").

10. Mr. Duda states in his complaint that he has been diagnosed as a manic depressive and a recovering alcoholic. The EEOC has acknowledged that bipolar disorder (formerly called manic depressive psychosis) is a disability under the ADA. *See* 8 FEPM 405:7461, 7462(BNA) (Mar. 25, 1997); *Den Hartog v. Wasatch Academy,* 129 F.3d 1076, 1081 (10th Cir.1997). Our court has recognized these illnesses as mental disabilities. *See Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1284 (7th Cir. 1996) (recognizing bipolar disorder as a mental disability covered by the ADA); *Despears v. Milwaukee County,* 63 F.3d 635, 635 (7th Cir.1995) (noting parties' acknowledgment that alcoholism is a disability under the ADA); *see also Den Hartog,* 129 F.3d at 1081 (holding that bipolar disorder is a mental disability covered under the ADA, collecting cases); *Miller v. National Cas. Co.,* 61 F.3d 627, 629–30 (8th Cir.1995) (recognizing manic depression as a mental impairment); *cf. Huels v. Exxon Coal USA, Inc.,* 121 F.3d 1047, 1049 (7th Cir.1997) (acknowledging without discussion that alcoholism is a disability); *Bryant v. Madigan,* 84 F.3d 246, 248 (7th Cir.1996) (noting without discussion that alcoholism and other forms of addiction are disabilities within the meaning of the ADA). *But see Burch v. Coca–Cola Co.,* 119 F.3d 305, 316 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 871, —— L.Ed.2d —— (1997) (alcoholism is not a per se disability under the ADA).

11. The discrimination provision of the ADA, 42 U.S.C. § 12112, offers an extensive definition of the term "discriminate," including subsection (b)(1), which states:

(1) limiting, segregating, or classifying a job applicant or employee in such a way that ad-

guidance to the regulations states clearly that "[r]eassignment may not be used to limit, *segregate,* or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities." 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) (emphasis added).[12] Therefore, we hold that Mr. Duda's claim of a forced transfer that segregated him is a viable allegation under the ADA.[13]

The amended complaint goes on to allege that, because of misperceptions about his mental illness, the defendants required him to inform them of counseling and medication changes as a condition of continued employment. We have no doubt that there are situations in which a prudent employer, concerned with the safety of its employees, would be justified in requiring information of this type from an employee suffering from a psychiatric illness, as long as the inquiries were actually related to his job and were necessary to the business. *See Yin v. State of California,* 95 F.3d 864, 867–68 (9th Cir. 1996) (concluding that, in light of the business necessity exception of the ADA, "when health problems have had a substantial and injurious impact on an employee's job performance, the employer can require the employee to undergo a physical examination designed to determine his or her ability to work, even if the examination might disclose whether the employee is disabled or the extent of any disability"), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997). At a later stage in this litigation, the School District will have an opportunity to demonstrate that it was necessary to make such an inquiry in this situation. We cannot say,

however, that Mr. Duda's allegations might not be supported by factual submissions that would support a judgment in his favor. The ADA does indeed prohibit employers from making disability related inquiries of its employees unless such information is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); [14] *See Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1230–31 (10th Cir.1997) (concluding that employer's policy of requiring employee to report all prescription drugs she used violated the ADA unless the information was job-related); *Yin,* 95 F.3d at 867–68.

The amended complaint also alleges that Mr. Duda was subjected to discrimination when he was told that he was not to apply for another position because of the incident involving his diary. On the face of the amended complaint—the full extent of the permissible inquiry at this stage of the proceedings— we cannot say that Mr. Duda would be unable to establish a factual predicate for relief. One of the ADA's basic tenets is that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to *job application procedures*" and other employment conditions. 42 U.S.C. § 12112(a) (emphasis added). In the next statutory subsection, "discrimination" is defined to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant." § 12112(b)(5)(B). Mr. Duda's claim that the School District discrim-

---

versely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee.

**12.** The EEOC's interpretive guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (internal quotations and citations omitted).

**13.** *Cf. Gile v. United Airlines, Inc.,* 95 F.3d 492, 497–98 (7th Cir.1996) (discussing employee's entitlement to reasonable accommodation request-

ed, analyzing ADA's provisions on reassignment); *Hankins v. The Gap, Inc.,* 84 F.3d 797, 802 (6th Cir.1996) (concluding that, because plaintiff, who was denied the transfer she sought, refused to accept reasonable accommodations that were available and offered, she was not a qualified individual with a disability).

**14.** The ADA provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

inated against him on the basis of his disability by refusing to let him apply for the bus driver position survives the motion to dismiss. *See Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1098–1100 (D.C.Cir. 1997) (reviewing plaintiff's claim that defendant's refusal to let her apply for a position was discriminatory, concluding that she failed to prove defendant's reason was pretextual); *cf. Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir.1997) (stating that an "employer could not refuse to consider [plaintiff] for the promotion because of his dyslexia," but may give promotion, without discriminating, to the employee who can do the job better); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459–60 (7th Cir.1995) (finding that employer who refused to give plaintiff an application had nondiscriminatory reasons for refusal to allow plaintiff to apply).

In sum, we conclude that Mr. Duda's amended complaint sufficiently alleges facts to establish a disability claim under the ADA. Accordingly, we reverse the district court's dismissal of this count. *See Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959 (7th Cir.1996).

### C. *Constitutional Claims Alleged Under 42 U.S.C. § 1983*

Mr. Duda contends that Messrs. Pietrini, Barry, Kanaverskas and Hrejsa, all management employees of the School District, condoned, acquiesced and participated in the violation of Mr. Duda's Fourth Amendment rights when they failed to investigate the circumstances surrounding the theft of his diary pages and when they failed to discipline Messrs. Bagnole and Beyer for the theft of the pages. To the extent that these allegations are brought against the defendants in their official capacities, they must fail. The defendants are not officials "who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598

(1989). "[W]hether a particular official has 'final policymaking authority' is a question of *state law." City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). "[O]ur understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian v. Monroe County, Ala.*, —— U.S. ——, ——, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997).

In Illinois, the School District's Board of Education has full power to manage the schools and to adopt all rules and regulations needed for that broad purpose. *See* 105 ILCS 5/10–20.5. The Illinois School Code requires the principal to submit personnel recommendations to the superintendent and requires the superintendent to make personnel recommendations to the board. *See* 105 ILCS 5/1021.4 (superintendent's administrative and personnel decisions are under direction of the board of education); 105 ILCS 5/10–21.4a (principal's administrative and personnel responsibilities are under supervision of superintendent). Nothing in the School Code allows us to infer that a superintendent or principal has been delegated policymaking authority with respect to personnel decisions. *See Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1325–26 (7th Cir.1993) (finding that the Illinois School Code offers nothing from which to infer that a disciplinary dean has been delegated policymaking authority). Beyond his bare allegations, Mr. Duda provides no basis for concluding that any of these defendant school officials—the superintendent, principal, business manager or director of buildings and grounds—is a final policymaker.[15] Mr. Duda has not stated a claim from which we could conclude that the defendants, acting in their official capacities, are liable under § 1983.

To the extent that these allegations are brought against the defendants in their individual capacities, they have the protection of the qualified immunity doctrine. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.

---

15. Nor has Mr. Duda suggested any School District policy concerning the handling of the taking of his diary which could have affected their actions.

2727, 2738, 73 L.Ed.2d 396 (1982) ("[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). Mr. Duda, in his amended complaint, did not carry his burden of showing that it was clearly established at the time the defendants acted that they had an affirmative obligation to act as Mr. Duda alleges they were obliged to do. *See Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 736–37 (7th Cir.1994). At the time of this incident, moreover, preexisting law did not dictate the conclusion for these school officials that their failure to investigate or to punish violated Mr. Duda's constitutional right to privacy. *See Khuans v. School Dist. 110*, 123 F.3d 1010, 1019–20 (7th Cir.1997) (" 'For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel ... the conclusion for every like-situated, reasonable government agent that what [he] is doing violates federal law in the circumstances.' ") (quoting *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir.1994)) (concluding that qualified immunity applied to school superintendent). Under the circumstances before us, therefore, because preexisting law did not require the defendants to act as Mr. Duda alleges they should have acted, the School District officials could not reasonably have known they were violating the Constitution by failing to take those actions.

In Count III of the amended complaint, Mr. Duda alleges that the same defendants violated his constitutional right to privacy under the Fourteenth Amendment when they knowingly allowed and "maliciously failed to prevent" the distribution of his diary pages. Again, to the extent that the amended complaint makes only general allegations brought against these employees in their official capacity, it appears that, as a matter of state law, none of them was a final policymaker. To the extent that the allegations are made against the defendants in their personal capacity, they enjoy qualified immunity. The right of privacy asserted by Mr. Duda was not sufficiently defined,[16] nor was it clearly established that the defendants had an affirmative duty to act.

### Conclusion

Because Mr. Duda's amended complaint should have been received by the district court, it is the operative pleading for disposition of the defendants' motion. The amended complaint sets forth adequately claims for relief under the ADA. The district court must therefore deny the motion with respect to those claims. The amended complaint does not allege adequately a claim under § 1983; those claims ought to be dismissed.

Accordingly, the judgment of the district court is reversed. The case is remanded for proceedings consistent with this opinion. Mr. Duda may recover the costs of this appeal.

REVERSED and REMANDED.

---

16. Mr. Duda claimed that he has a privacy interest in the personal matters he wrote in his diary and that he suffered public humiliation and anguish as a result of defendants' acts. Certainly the disclosure of his private thoughts in the diary was unwarranted and improper. However, Mr. Duda alleges that the School District officials' failure to prevent the distribution of the diary is a constitutional violation. We cannot say that such an allegation states a recognized constitutional privacy claim. *See Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (holding that neither the immediate nor the threatened impact of plaintiffs' interest in keeping information private was sufficient to constitute an invasion of a right under the Fourteenth Amendment); *see also Roach v. City of Evansville*, 111 F.3d 544, 550 (7th Cir.1997) (rejecting plaintiff's claim that his right to be left alone from unwanted intrusion by the government is a privacy right).