In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2279

KENNETH TYLER,

Plaintiff-Appellant,

v.

ISPAT INLAND INC.,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:98CV634AR--Andrew P. Rodovich, Magistrate Judge.


Argued February 20, 2001--Decided April 5, 2001


  Before EASTERBROOK, EVANS, and WILLIAMS, Circuit
Judges.

  EVANS, Circuit Judge.  A plaintiff seeking
damages and injunctive relief under the Americans
with Disabilities Act by virtue of a mental
illness faces a treacherous road to recovery. If
he submits insufficient proof of the symptoms of
his illness, a trier of fact might well conclude
that he is not "disabled," and is, therefore,
outside the protective scope of the Act. On the
other hand, if his mental illness manifests
itself in the form of delusions or
hallucinations, it is difficult to argue that an
employer should have accommodated the disability
by addressing working conditions that are the
product of the employee's imagination. Kenneth
Tyler, the plaintiff in this case, was tripped up
by this second hurdle at the summary judgment
stage. We review de novo the district court's
decision dismissing the case. Moore v. J.B. Hunt
Transp., Inc., 221 F.3d 944, 950 (7th Cir. 2000).

  Tyler has worked for Ispat Inland Inc. since
1979, most recently as an electrician. In the
early 1990's, while working at Ispat's Plant 2
Blast Furnaces Department, Tyler began to feel
threatened by his coworkers. Specifically, he
alleged that they sabotaged his work, falsely
accused him of stealing a computer, and
threatened to burn his house down and poison him
by putting asbestos in his food. Only the

allegations concerning the computer theft were ever substantiated: A coworker at Ispat did accuse Tyler of stealing the computer, but an investigation revealed that it had not been stolen, and no action was taken against Tyler or anyone else.

In December 1994 Tyler's doctor concluded that he was "unable psychologically to handle stress." The doctor restricted Tyler to the day shift and referred him to a psychiatrist. Ispat complied with the doctor's restrictions by limiting Tyler's work schedule to the day shift. The psychiatrist to whom Tyler was referred, Dr. Suhayl Nasr, concluded that Tyler suffered from "Atypical Depression R/O Delusional Disorder Persecutory." Dr. Nasr prescribed antidepressant medication for Tyler, and he was taken off work indefinitely.

Tyler returned to work in November 1995 and was reassigned to Plant 7, where he would be separated from the individuals who allegedly harassed and threatened him in Plant 2. Tyler received the same wages and benefits at Plant 7 as he had at Plant 2. Sadly, Tyler soon came to believe that his coworkers at Plant 7 were harassing him as well. For example, when one of his car tires fell off on his way home from work, Tyler became convinced that his coworkers had loosened its lug nuts. This was only a "belief" on Tyler's part, as no evidence substantiating the event was ever presented. Tyler also asked that he be permitted to park his car in a parking lot reserved for office personnel, but Ispat denied his request.

Unable to resolve his fears, Tyler eventually decided he wanted to be transferred back to Plant 2. At Tyler's request, Dr. Nasr sent a letter to Ispat stating that Tyler "has been feeling stressed by his current location at work" and recommending that he be returned to Plant 2. Ispat did not transfer him back. On August 27, 1997, Dr. Nasr suggested that Tyler take 2 months off work and offered him an antipsychotic medication. Tyler refused to take the medication because it was "for people who are seeing things," and Tyler believed his fear of his coworkers was justified.

Dr. Nasr released Tyler to return to work in late December 1997. Prior to reporting for work in January 1998, Tyler complained that the company had done nothing to prevent his former coworkers at Plant 2 from applying for transfers to Plant 7 so they could continue to harass him. Frank Wright, Tyler's brother-in-law and the Plant 7 furnace maintenance planner, assured Tyler that if anyone from Plant 2 requested a

transfer (and nothing indicates that anyone did), Ispat would deal with the issue at that time. In addition, Tyler spoke with Ron Allen of the company's Personnel Services Department and informed him that the only thing that would make him feel safe at work would be to confront the Plant 2 employees who had accused him of computer theft in 1991, and for the company to make a full investigation of that incident. In an effort to evaluate the propriety of these requested "accommodations" and develop further appropriate accommodations, Ispat asked to examine Tyler's medical records, but he refused to release them. Dr. Nasr subsequently diagnosed Tyler with a "paranoid disorder," a diagnosis Tyler disputes.

Ispat ultimately refused to transfer Tyler back to Plant 2. He then brought this suit under the ADA, 42 U.S.C. sec. 12101 et seq., alleging that the company failed reasonably to accommodate his disability of mental illness. The district court granted summary judgment in favor of Ispat, finding that Tyler suffered no adverse employment action and that the company had reasonably accommodated him.

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. sec. 12112(a). Where there is no direct evidence of disability discrimination, a plaintiff may prove his case indirectly by employing the burden-shifting approach set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973). Under the McDonnell Douglas method of proof, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 672 (7th Cir. 2000), petition for cert. filed, ___ U.S.L.W. ___ (U.S. Feb. 12, 2001) (No. 00-1294). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. Id. Finally, the burden shifts back to the plaintiff to prove that the employer's articulated reason for the employment action was a pretext for discrimination and that the decision was in fact motivated by an unlawful factor. Id. Although the burden of production rests on the employer for the second stage of the McDonnell Douglas inquiry, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Because Tyler lacks direct evidence of

discrimination, our analysis starts with the elements of a prima facie case. In order to establish a prima facie case of disability discrimination under the ADA, Tyler must show (1) that he is a "qualified individual with a disability," (2) that his work performance met Ispat's legitimate expectations, (3) that he suffered an adverse employment action, and (4) that his disability was the motivation for the adverse employment action. See Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir. 1997). Ispat does not dispute that Tyler's mental illness constitutes a disability under the ADA and that his work performance was satisfactory, so we will assume he is a "qualified individual with a disability" under the Act. Ispat argues, however, that it took no adverse employment action against Tyler and that it reasonably accommodated his disability.

We agree that Tyler suffered no adverse employment action. Although an adverse employment action "is defined quite broadly in this circuit," not everything that makes an employee unhappy can form the basis of a federal discrimination suit. Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). Rather, the action must cause an adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or alteration of job responsibilities. Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993). Thus, we have held that a lateral transfer of an employee who retains the same salary and benefits is not, without more, sufficient to constitute an adverse employment action. Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996); Flaherty v. Gas Research Inst., 31 F.3d 451, 457 (7th Cir. 1994); Crady, 993 F.2d at 136. Moreover, even the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary. See Rabinovitz v. Pena, 89 F.3d 482, 488–89 (7th Cir. 1996) (bonus); Fyfe v. City of Fort Wayne, Ind., No. 00-1396, slip op. at 9 (7th Cir. Feb. 22, 2001) (reimbursement of expenses).

Under this framework, Tyler can point to no adverse employment action taken against him. Because his salary and benefits remained the same after his transfer to Plant 7, the transfer alone is insufficient. See Flaherty, 31 F.3d at 457. Plus, this transfer (apparently ironed out in an agreement with the company and Tyler's union) was satisfactory to Tyler at the time as it removed him from the harassment he perceived from the crew in Plant 2. Tyler attempts to add meat to

the bones of his argument by claiming that Plant 2 employed certain equipment that was not available in Plant 7, and that he could have applied for a promotion if he had gained experience using that equipment. But this is pure speculation. Tyler does not assert that he had any entitlement to use the equipment in question, and even if he did he would not necessarily have been entitled to a promotion. Any connection between Tyler's transfer and his failure to achieve a promotion is tenuous at best, and the transfer, we conclude, cannot be viewed as an adverse employment action. See Rabinovitz, 89 F.3d at 488-89.

Tyler also contends that Ispat failed reasonably to accommodate his disability. The ADA requires employers to provide reasonable accommodations for qualified employees--such as job restructuring, modification of equipment, or reassignment to a vacant position--to enable employees to perform the essential functions of their jobs. See 42 U.S.C. sec. 12111(9); Vande Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995). Although the complaint does not explicitly spell out what accommodations Tyler requested at various times, he makes three principal arguments: (1) his transfer to Plant 7 was not a reasonable accommodation, (2) the appropriate reasonable accommodation at the time of his transfer would have been to investigate fully his concerns and assure his safety, and (3) after 2 years at Plant 7 the appropriate reasonable accommodation would have been to transfer him back to Plant 2. We must reject each of these arguments.

As an initial matter, the accommodation Ispat supplied--transfer from Plant 2 to Plant 7--was, as we have noted, entirely reasonable. Tyler's medically diagnosed paranoia and delusions of persecution, of which Ispat was aware, caused him to fear his coworkers in Plant 2. We can think of no better way to allay his fears, short of psychological treatment for his underlying condition, than to physically separate him from the individuals he thinks were harassing him. Although Tyler contends that the company did nothing to prevent Plant 2 coworkers from transferring to Plant 7, there is no evidence that anyone sought such a transfer. Moreover, even if Tyler's fears had some basis in fact, separation from the problem individuals would still be an appropriate, reasonable accommodation.

Tyler also contends that the transfer was not a reasonable accommodation because it unlawfully "segregated" him. In Duda v. Board of Education of Franklin Park Public School District No. 84,

133 F.3d 1054, 1059-60 (7th Cir. 1998), we held that a school janitor stated an ADA claim when the school district transferred him to a location in which he was forced to work alone and instructed him not to speak to anyone after it learned of his mental illness. Because segregating an employee is a form of discrimination under the ADA, 42 U.S.C. sec. 12112(b)(1), we held that the transfer raised a triable issue of fact on the reasonable accommodation issue. Id. Our case is easily distinguished, however, because there is no evidence that Tyler was segregated. Indeed, Tyler does not dispute Ispat's assertion that he was fully integrated into the Plant 7 work force after his transfer.

Tyler next argues that the only reasonable accommodation at the time of his transfer would have been to investigate his concerns at Plant 2 and ensure his safety. Similarly, Tyler contends that the company should have permitted him to park in a special parking place because he feared that Plant 7 workers would tamper with his car. But Ispat knew that Tyler experienced delusions of persecution, so reason did not require the company to expend resources to investigate his accusations or to take unnecessary safety precautions on his behalf. Quite simply, it was not unreasonable for Ispat to think Tyler's fears were the product of his illness, and no investigation of the basis of those fears would have allayed them. The company did its best to accommodate Tyler by transferring him away from the individuals he feared and assuring him that any request by his former coworkers to transfer to Plant 7 would be dealt with in an appropriate manner.

Finally, Tyler argues that Ispat should have transferred him back to Plant 2 and that its failure to do so constitutes the denial of a reasonable accommodation. But Plant 2 is where Tyler's safety concerns originated, and he was transferred out to accommodate his disability. Although Dr. Nasr requested that Tyler be transferred back, he never said Tyler could not handle the stress at Plant 7, nor did he explain why another transfer would alleviate the safety concerns or why Tyler needed to confront his former coworkers concerning the 1991 computer theft accusations. When the company sought access to Tyler's medical records to help answer these questions (or determine an alternative appropriate accommodation), Tyler refused to release them./1 Without this cooperation from Tyler, Ispat cannot be held liable for failure to design a perfect accommodation. See Beck v. University of Wis. Bd. of Regents, 75 F.3d 1130, 1136-37 (7th Cir. 1996) (affirming summary

judgment for employer because employee caused breakdown of interactive process of designing reasonable accommodation by refusing to release medical records). And without a medical explanation for Tyler's request to transfer back to Plant 2, old-fashioned common sense dictated that he be kept away from the original source of his stress.

AFFIRMED.


/1 Tyler argues that Ispat's request for his medical records was somehow improper. We recognized in Duda, however, that such a request is permissible if related to the employee's job and necessary to the business. 133 F.3d at 1060. Here, Tyler was requesting a return to the place his problems began. Because such a transfer is not a costless transaction for the company, Ispat had every right to seek information concerning Tyler's psychological ability to handle the working conditions in Plant 2.