Sharon VINSON, Plaintiff,

v.

CUMMINS ENGINE COMPANY,
INC., Defendant.

No. IP 98–0223–C M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 3, 1999.

Stephanie J. Hahn, Kendall Law Office, Indianapolis, IN, for plaintiff.

Martin J. Klaper, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendant.

### ORDER ON SUMMARY JUDGMENT MOTION

McKINNEY, District Judge.

This matter comes before the Court on the motion of defendant, Cummins Engine Co., Inc. ("Cummins"), seeking summary judgment on the claim against it brought by former employee Sharon Vinson ("Vinson") under the Americans with Disabilities Act of 1990 ("ADA").[1]  *See* 42 U.S.C. § 12112(a) (prohibiting discrimination against a qualified individual with a disability because of that disability).  Vinson alleges that she was terminated from her position at Cummins because she was regarded as having a disability as defined in the ADA. *See* 42 U.S.C. § 12102(2).  Cummins asserts that Vinson was terminated because of her job performance, which placed her among a group of individuals selected for termination during a workforce reduction.  For the reasons further explained below, the Court **GRANTS** the defendant's motion for summary judgment.

### I. FACTUAL BACKGROUND

Cummins is a corporation engaged in the manufacture of diesel engines with headquarters in Columbus, Indiana.  Vinson Dep. at 13.  The plaintiff, Sharon Vinson, began working for Cummins as a senior program

---

1.  As originally filed, Vinson's complaint named as defendants Cummins Engine Company, Inc., d/b/a Leafguard, Great Lakes Foundry, HOLSET, and Pioneer Metals Company.  Compl. ¶ 7.  During Vinson's deposition, her counsel indicated that Cummins was the only defendant in this case. Vinson Dep. at 14.  That statement was confirmed in the Plaintiff's Final Statement of Contentions, filed October 20, 1998.  Plf's Final Contentions, ¶ 17.

analyst in August of 1988, and she held that position until her discharge in August of 1995. Vinson Dep. at 14–16. Vinson was assigned to work in the Corporate Management Systems ("CMS") department at Cummins's main headquarters, a department responsible for designing, developing and maintaining computer systems used throughout the corporation. *Id.* at 16. In the CMS department Vinson worked primarily in the Systems Development area, where she was responsible for assisting in the detail, design, coding, testing, implementation, documentation and maintenance of several systems used by Cummins in the United States and the United Kingdom. Vinson Dep. at 28. In addition, she was assigned the task of creating and implementing a training program for persons in the United Kingdom ("UK"), and a corresponding role as UK liaison. Vinson Dep. at 35.

During her seven years at Cummins, Vinson was supervised by a number of different managers, including Jane Kennedy ("Kennedy"). Vinson Dep. at 26–28. Kennedy supervised Vinson from March 1992 to January 1994, and again from May 1994 to December 1994. *Id.;* Vinson Dep.Ex. 7, "Letter to EEOC dated May 20, 1996." Vinson's managers were responsible for directing her work, assigning projects, setting priorities and evaluating her performance. *Id.* at 26–27, 41–42. In turn, they were supervised by a man named Wynne W. Gulden ("Gulden"), vice president of Information Processes and Technology, who was responsible for the entire CMS department. Gulden Aff. ¶¶ 2, 3. Gulden assumed this position in 1992 and held it throughout the time of the events in question. *Id.*

Employees at Cummins typically had their performance reviewed twice a year—once at mid-year and again after the end of the calendar year. Kennedy Aff. ¶ 8; Vinson Dep. at 81–82. Only the annual performance evaluation, a formal, written review accompanied by a numerical rating, was used for compensation decisions. Kennedy Aff. ¶ 8. The mid-year evaluation was written but less formal, and did not result in a change in pay. *Id.* Kennedy, as a result of two assignments as Vinson's manager, was responsible for reviewing Vinson's performance for 1992, 1993, and 1994. Kennedy Aff. ¶ 11.

At one point during Kennedy's first management period, Vinson told Kennedy about treatment she had received for depression in 1982, and assured her supervisor that it would not interfere with or affect her work at Cummins. Vinson Dep. at 48. This disclosure may have been prompted by Vinson learning she had miscarried a pregnancy, sometime in 1992, and becoming emotionally upset at the office. *Id.* at 57, 108, 190. When she told Kennedy about the miscarriage Kennedy suggested that she talk with Solutions, a counseling service with which Cummins contracts for its employee assistance program. *Id.* at 56, 58. Vinson considered the suggestion a caring gesture, and she visited a counselor at Solutions two times as a result. *Id.* at 59.

Vinson characterized her relationship with Kennedy as positive throughout the first period of Kennedy's management. Vinson Dep. at 62. At no time during that period did Vinson notice any change in Kennedy's attitude toward her—not after she had confided about her former treatment for depression, or after she sought counseling from Solutions following her miscarriage. *Id.* at 62–63. According to Vinson, Kennedy's attitude only changed during the second period of Kennedy's supervision. *Id.* at 52. For example, Vinson noticed that Kennedy would no longer initiate friendly contact with her. *Id.* She also stated that Kennedy would "continuously suggest" that Vinson go to Solutions. *Id.* at 52–53. Vinson testified that Kennedy's counseling suggestions occurred at least twice a month, whenever Kennedy thought Vinson had too much to do and was stressed. *Id.* at 54. Another change during the second management period was that Kennedy became more critical of Vinson's performance, especially with respect to her time-management skills, and the amount of time she spent on the UK liaison role. Vinson Dep. at 65, 118, 120, 124–26. Kennedy also told Vinson she should work on learning more about newer technologies. Vinson Dep. Exs. 6, 8.

Hints of these concerns first appeared in Vinson's annual evaluation for 1992, given to

her in February of 1993, during Kennedy's first management period. Vinson Dep.Ex. 5, "1992 Performance Eval." In it, Kennedy wrote that Vinson should "scope down" or limit the amount of time she was spending on her UK liaison role to no more than five hours a week, noting that "the key is to develop an appropriate mix of time between the liaison role and assigned project activities." *Id.* Kennedy also wrote that Vinson could further develop her project leadership skills by managing multiple projects and resources. *Id.* at § 6. In addition, Vinson should consider the "80/20 rule" when scheduling or planning tasks, and "improve on-time delivery through effective time management techniques, and through effective delegation." *Id.* Vinson was asked to work on her understanding of the bigger picture in Cummins's overall business plan. *Id.* Finally, Kennedy told Vinson to "begin to look beyond current assignments for future development opportunities." *Id.* Specifically, she said Vinson should "develop skills in newer technologies/tools in support of future growth into new areas." *Id.*

In her 1993 evaluation of Vinson, Kennedy observed that Vinson had completed a lengthy and difficult project with "utmost quality." Vinson Dep.Ex. 6, "1993 Year End Performance Summary." She also noted another project was put on the "back burner" while Vinson completed the first one, and cautioned that it was important for Vinson to complete the latter project on time in 1994. *Id.* It was scheduled to be completed in February of 1994. *Id.* Kennedy credited Vinson's UK liaison role with improving the CMS department's working relationship with those in the UK, but noted she should continue to work on prioritizing time commitments among maintenance, development and consultation. *Id.* The specific areas Kennedy identified for improvement included Vinson expanding her technical ability, improving project management, looking at issues from a "higher-level perspective," working on prioritizing her time to improve on-time project delivery, understanding the difference between "wants" and "needs," and improving project estimating and scheduling. *Id.* In sum, Kennedy noted that Vinson had "development opportunities for 1994 such as man-aging multiple projects, setting and meeting definite project schedules, and learning to recognize the difference between postponed perfection vs. continual improvement." *Id.* Vinson has testified that she considered Kennedy's assessment of her performance during Kennedy's first management period to be both accurate and positive, which includes the 1992 and 1993 performance evaluations. Vinson Dep. at 46–47, 110.

When giving its employees a written evaluation at year-end, Cummins's management assigns a numerical ranking to their performance. Kennedy Aff. ¶ 9; Gulden Aff. ¶ 6. That ranking was only given orally, although a record of it was kept in Cummins's personnel database. *Id.;* Vinson Dep. at 86; Kennedy Aff. ¶¶ 9, 12. The parties disagree about whether Cummins changed its rating scale during the time of Vinson's employment. Vinson Dep. at 114–15. In 1990, managers used a scale of one to five, with one meaning the employee "far exceeds requirements" (the highest) and five meaning the employee "falls short of requirements" (the lowest). Vinson Dep.Ex. 2, "1990 Performance Summary." A rating of "three" in this system indicated the employee "meets requirements." *Id.* According to the defendant, this scale changed in early 1993 with the new scale applying to all annual reviews from 1992 on Kennedy Aff. 12; Gulden Aff. ¶¶ 5–6. This new scale ranged from one to three, with one indicating "exceeds expectations," two indicating "meets expectations," and three indicating "fails to meet expectations." Gulden ¶ 6; Kennedy ¶ 12. In addition, because of concern that managers might be too lenient under the new system, the Human Resources Department directed that no more than 10% of the employees could be rated a "one" and at least 5% had to be rated a "three." Gulden Aff. ¶ 6.

What is not disputed is that Vinson's numerical rating for 1992, whether a "three out of five" or a "two out of three," indicated that she met Cummins's expectations of her. Kennedy Aff. ¶ 11; Vinson Dep. at 86, 109. Although Vinson stated she did not recall what numerical rating she received on her 1993 evaluation, she contends it was based on a one to five scale. Vinson Dep. at 109. She

also recalled not having ever received any rating but a three out of five. *Id.* According to Kennedy, Vinson's 1993 rating was a three, but it was out of three, meaning she failed to meet her employer's expectations for that year. Kennedy Aff. ¶ 11. Vinson does, however, admit that her 1994 annual review yielded a lower rating, which she termed as "below average." Vinson Dep. at 129–30. Kennedy reports that the 1994 rating was also a three out of three. Kennedy Aff. ¶ 11.

Foreshadowing the negative annual review in 1994 was Kennedy's mid-year evaluation of Vinson's performance in September, 1994, which was less' positive than any before. Vinson Dep. at 115. In this review, Kennedy mentioned the amount of overtime Vinson spent working on the project that had a February 1994 deadline, and stated that "while this is admirable and shows dedication, Sharon needs to analyze why such heroics are necessary and work toward eliminating the root causes." Vinson Dep.Ex. 8, "1994 Mid-year Performance Summary." The project was not completed until June of 1994. *Id.*

The 1994 mid-year review also mentions a performance improvement plan developed for Vinson as a result of the low rating on her 1993 review, and implemented during 1994. *Id.* at 2. A copy of the performance improvement plan was said to be attached to the mid-year review, and Kennedy noted that Vinson "had received the plan well." *Id.* at 2; Kennedy Aff. ¶¶ 11, 18–20. Vinson's 1994 year-end review contained similar criticisms of her performance in connection with project management skills, and referred to her need to learn newer technologies, the need for her to see the big picture, and her difficulty with managing her time. Vinson Dep.Ex. 11, "1994 Year End Performance Summary" at 3. According to both Kennedy and Gulden, Vinson's rating of three out of three for both 1993 and 1994 placed her among the bottom 10% of employees in the department. Kennedy Aff. ¶ 12; Gulden Aff. ¶ 8.

All of these reviews occurred against a backdrop of change at Cummins. According to Gulden, after serving for some time as vice president over the CMS organization, he concluded that it had a significant number of poor performers, especially in the Systems Development group where Vinson worked. *Id.* ¶ 4. He was particularly concerned about the number of employees who seemed to have "experience only in mainframe-related computer applications that were becoming outdated, and not in the newer technologies. . . ." *Id.* As a result, Gulden implemented an "Organizational Development Review" process in late 1992 and early 1993, in an effort to help managers identify both organizational needs and poor performers. *Id.* ¶ 5. The process involved meetings among the various managers in the organization at which they discussed the performance of employees reporting to them and reached a consensus about how to assign numerical ratings to that performance. *Id.* ¶ 5–6. One result of this organization review, was a change in the annual review rating scale for the CMS organization from a five-point to the three point scale. *Id.* ¶¶ 5–6.

During the discussions about employee performance, Gulden specifically recalled hearing about Vinson's performance and her manager's recommendation that she be rated a three out of three for 1993 and 1994. Gulden Aff. ¶¶ 7–8. The management group had agreed with Kennedy's recommendation based on their observations of Vinson's performance compared to other programmers. Kennedy Aff. ¶ 18. As the organization review progressed, by the second quarter of 1995, Gulden's staff began the process of finding other work for marginal employees or separating them from the company. *Id.* ¶ 9. At about the same time, Cummins began to experience financial difficulties, and its president. Theodore M. Solso, "directed that the salaried workforce be reduced by 10% during the remaining months of the year." *Id.* ¶ 10. This order prompted Gulden to accelerate his previously-implemented program for weeding out poor performers. *Id.* ¶ 11. Subsequently, Gulden "initiated the involuntary separations of most of the employees who had been rated as '3s' and some of the employees who had been rated as '2s,' but who were viewed as marginal performers." *Id.* ¶ 11. Among those employees was Vinson, who was termi-

nated as of August 16, 1995. *Id.* ¶ 12; Kennedy Aff. ¶¶ 28–31; Vinson Dep. at 144.

Vinson filed a charge of discrimination with the EEOC on March 8, 1996, and she received a notice that her charge was dismissed on November 18, 1997, along with a right to sue letter. Vinson Dep.Exs. 16, 18. This action was filed on February 17, 1998, just within the ninety-day period for filing suit under the ADA. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 12117, § 2000e–5(g) and 28 U.S.C. § 1331. Having reviewed the factual background, the Court now turns to a brief overview of the standards governing its decision.

## II. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion has an affirmative duty of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). To fulfill that duty, the non-movant must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong*

*v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). If a reasonable factfinder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.,* 975 F.2d at 1294.

In the context of employment discrimination cases, when issues of intent and credibility are crucial to resolving the dispute, the standard for summary judgment is applied with "added rigor." *Vanasco v. National–Louis Univ.,* 137 F.3d 962, 965 (7th Cir. 1998). Nevertheless, if the non-moving party bears the burden of proof on an issue, "that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Id.* He or she must "affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial." *Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994) (quoting "added rigor" phrase from *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994)).

### B. ADA STANDARDS

The ADA prohibits discrimination against, and requires an employer to reason-

ably accommodate the known limitations of, an otherwise qualified employee with a disability. 42 U.S.C. § 12112(a), (b). Unlawful discrimination against an otherwise qualified employee includes both discriminatory discharge and failure to make a reasonable accommodation. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Determining which employees are protected by this federal law requires a positive response to two questions. *See Leisen v. City of Shelbyville*, 153 F.3d 805, 807 (7th Cir.1998). First, does the employee have a disability as that term is defined in the act? *See* 42 U.S.C. § 12102(2); *Leisen*, 153 F.3d at 807. Second, is the employee an otherwise qualified individual? *See Leisen*, 153 F.3d at 807. It is the employee's burden to show that her claim falls within the protection of the ADA. *See Corder v. Lucent Tech., Inc.*, 162 F.3d 924, 927–28 (7th Cir.1998). These two questions correspond to the first two elements of a *prima facie* case.

■ To meet the first element, an employee may establish that she:

1. has a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

2. has a record of such an impairment; or

3. is being regarded as having such an impairment.

42 U.S.C. § 12102; *Duda v. Franklin Park Pub. Sch. Dist. 84*, 133 F.3d 1054, 1058 (7th Cir.1998). The regulations further explain the meaning of each of these definitions. *See* 29 C.F.R. § 1630.2(g) to (*l*); *Duda*, 133 F.3d at 1058.

■ The second element involves establishing that the employee is a "qualified individual" with a disability. *Id.* An employee meets this standard by proving she is able to perform the essential functions of the position she holds or desires, with or without a reasonable accommodation. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996). Only after an employee establishes that she is a qualified individual with a disability may the court turn to the issue of whether the employer terminated her because of the disability. *Duda*, 133 F.3d at

1059; *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 459 (7th Cir.1997).

■ To further satisfy her *prima facie* case of discrimination under the ADA, a plaintiff must also establish that her work performance met the employer's legitimate expectations, and that the employer terminated her because of her disability. *See White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995); *see also Leffel v. Valley Financial Servs.*, 113 F.3d 787, 793 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). The last element may be proved by showing that "persons not disabled or perceived to be disabled were treated more favorably than the plaintiff. . . ." *Leffel*, 113 F.3d at 793. Although proof of disparate treatment is "one of the most obvious ways to raise an inference of discrimination," it is not the only means. *Id.* at 794. Establishing a *prima facie* case, however, is a necessary predicate to any requirement that the employer justify its actions. *Bombard*, 92 F.3d at 563.; *White*, 45 F.3d at 361.

■ As with any other employment discrimination suit, a plaintiff may prove her case using either a direct or indirect method of proof. *Leffel*, 113 F.3d at 793 (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995)). When no direct evidence exists, the plaintiff may point to circumstantial evidence that gives rise to the inference of discrimination. *Id.* Courts examine this evidence using the familiar *McDonnell–Douglas* burden-shifting framework. *Leffel*, 113 F.3d. at 792 (specifically adopting the *McDonnell–Douglas* framework for ADA cases). Within that framework, the first step is the *prima facie* case as just described. *Id.*

■ Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* Having given that reason, the defendant shifts the burden of production back to the plaintiff, who must show that the proffered reason is really a pretext for discrimination. *Id.* To overcome summary judgment, the plaintiff must come forward with evidence that, if believed, will satisfy

each element of the prima facie case, and render the defendant's proffered explanation unworthy of credence. *See DeLuca, v. Winer Indus., Inc.,* 53 F.3d 793, 798 (7th Cir. 1995) (citing *Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994)). To call the defendant's proffered reasons into question, a plaintiff must produce sufficient evidence to show either that there is no basis in fact for the stated reasons, that they are not the real reasons, or that the stated reasons are insufficient to warrant the adverse action. *See Vanasco,* 137 F.3d at 965; *Anderson,* 13 F.3d at 1122.

■ When the case involves a reduction in the workforce ("RIF"), the pretext analysis differs slightly. Unlike an ordinary discrimination case, the question in a RIF case is not whether the employee was or was not performing satisfactorily, but whether the employer "honestly believed that [the plaintiff] was the weakest member of the department." *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995). Thus, not only will a plaintiff terminated during a RIF need evidence that a similarly-situated employee was treated more favorably during the selection process, but also that the decision-makers did not honestly believe in the reasons they gave for the different treatment. *See Collier v. Budd Co.,* 66 F.3d 886, 891 (7th Cir.1995). If an employer honestly believes the reasons it offers for its decision, no matter how ill-informed, ill-considered, trivial or baseless the reasons may be, the explanation is not a pretext. *Kariotis v. Navistar Int'l Trans. Corp.,* 131 F.3d 672, 676–78 (7th Cir.1997) (citing *McCoy,* 957 F.2d at 373; *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)).

### III. DISCUSSION

■ Vinson does not claim to have a physical or mental impairment that substantially limits one or more major life activities, or a record of that sort of impairment. *See* 42 U.S.C. § 12102(2). Instead, she claims entitlement to the ADA's protection because she was "regarded as" having such a disability by her employer. *See Id.* To satisfy this element of the ADA's definition of disability, Vinson may show that she suffers from a physical or mental impairment that does not substantially limit a major life activity, but that is treated by her employer as such a limitation. *Riemer v. Illinois Dept. of Trans.,* 148 F.3d 800, 806 (7th Cir.1998) (citing EEOC implementation guidelines at 29 C.F.R. § 1630.2($l$)(1), (3)). She may also invoke the ADA's protection even if she has no impairment at all, but is regarded by her employer as having a substantially limiting impairment. *Id.; Johnson v. American Chamber of Comm. Pub., Inc.,* 108 F.3d 818, 819 (7th Cir.1997), A third way of meeting the "regarded as" definition would be if the employee had an impairment that is only substantially limiting because of the attitudes of others toward the impairment.[2] 29 C.F.R. § 1630.2($l$)(2).

■ According to Vinson, she has no current impairment, but she has a history of depression, which Kennedy "regarded as" a disability by "continuously suggesting" that Vinson get counseling. Her supervisor's perception that she had a mental impairment, Vinson contends, affected the evaluations she conducted of Vinson's performance. The problem with this theory is the lack of evidence to prove that Kennedy really regarded Vinson as disabled. Even if the counseling suggestions indicate that Kennedy regarded Vinson as having emotional problems, Vinson still must show that her employer regarded those problems as severe enough to substantially limit one or more major life activities. *See Riemer,* 148 F.3d at 806. In other words, she must produce sufficient evidence to show, or create a factual issue, that her employer perceived her to be "significantly restricted as to the condition, manner or duration under which [she] can perform a

---

**2.** Although the EEOC implementation guidelines are not controlling on the courts, they do provide "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Riemer,* 148 F.3d at 806, n. 6 (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

particular major life activity as compared to the average person in the general population's ability to perform that same major life activity." *Id.;* 29 C.F.R. § 1630.2(j). Once that showing is made, the court may determine whether this perception actually motivated the adverse employment action. *See Leffel,* 113 F.3d at 793.

Given the facts of this case, the major life activity of working is the only possible activity that Kennedy could have considered as substantially limited by Vinson's "impairment." Yet, there is no evidence that would support a finding that Kennedy perceived Vinson to be "significantly restricted" in her ability to work. Instead, the only evidence, viewed in the light most favorable to Vinson, is that Kennedy frequently responded to Vinson's apparent stress by suggesting counseling from the employee assistance program. That suggestion alone does not imply that Kennedy thought Vinson was incapable of performing any parts of her job. Like the court found in *Harrington,* it is not enough for an employer to regard an employee's health problems as adversely affecting his or her work. *Harrington,* 122 F.3d at 460. Rather, it must be shown that the employer regarded the employee as either unable to care for her or himself or unable to perform all of the duties of his or her job. *Id.*

The *Harrington* court held that the plaintiff did not produce sufficient evidence to show that the employer perceived him to be substantially limited in performing his job. *Harrington,* 122 F.3d at 460. Specifically, the court noted that the only evidence relating to this showing was Harrington's request for assistance in lifting when he first returned to work from surgery, and the fact that he had relayed to his supervisor his fears that he might have permanent problems. *Id.* The court wrote that the "nebulous self-reports to his immediate supervisor do not amount to an inference that management understood 'problems' to mean a substantial limitation at work...." *Id.* Similarly, Kennedy's suggestion that Vinson might benefit from counseling cannot be understood to

mean she thought Vinson had a substantial limitation at work. Kennedy knew Vinson had obtained counseling in 1992 and was still able to perform all aspects of her job. Moreover, it is common knowledge that many people seek counseling when they are experiencing periods of stress and they are able to continue performing at work and to take care of themselves. Thus, the evidence provided is insufficient to demonstrate that Kennedy perceived Vinson as substantially limited by a mental impairment from performing one or more major life activities.

Vinson also attempts to connect Kennedy's counseling suggestions with her subsequent negative reviews of Vinson's performance. She claims that she confided in Kennedy that she had previously been treated for depression, and that Kennedy subsequently interpreted any difficulties Vinson had on the job as evidence of continued depression. Her theory is that by "continuously suggesting" Vinson get counseling, Kennedy was revealing her own stereotypical prejudices against someone who had suffered a mental condition. *See* Vinson Dep. at 135. Further, because of that alleged prejudice, Kennedy gave Vinson inaccurate, unfair and lower performance evaluations, which resulted in Vinson's ultimate termination. *Id.* at 135–36. Additional proof that this is what happened, according to Vinson, is the fact that Kennedy "offered no reason for her termination," making it more likely than not that Vinson was terminated because of her employer's perception that she had a mental disability. Plf's Resp. to Def's Mot. for Sum. J. at 2.

The problem with this theory of causation, aside from the fact that Kennedy did provide Vinson with a reason for her termination,[3] is that it is not supported by any evidence in the record. Vinson told Kennedy sometime in 1992 that she had suffered depression in the past. Yet no adverse action was taken against Vinson until two years later. Vinson has no complaints about or disagreements with the performance review given her by Kennedy at the end of 1992, or even about the one given for calendar year 1993. She

---

3. Vinson testified that during the termination meeting, Kennedy did not voluntarily tell her why she was being let go. However, Vinson

asked for a reason, and Kennedy told her that the reasons were spelled out in Vinson's performance reviews. Vinson Dep. at 145.

also states specifically that her relationship with Kennedy was a positive one during the first management period, and that the alleged constant suggestions about counseling did not occur until the second period. If Kennedy's attitude toward Vinson changed as a result of learning that her employee had been treated for depression in the past, it does not follow that it would be two years later before she treated her any differently. These facts, provided by Vinson's own testimony, contradict a finding that Kennedy held any prejudices against her as a person who had suffered depression, which also undermines any theory that such a prejudice caused the negative performance evaluations.

Vinson attempts to bolster her theory by noting "inconsistencies" and "contradictions" she contends are supported by the evidence. The Court has identified at most nine factual disputes between the parties' versions of the story, none of which are material given Vinson's failure to establish that she was regarded as disabled under the ADA, and to show a connection between any perception that she had an impairment and her subsequent negative evaluations. Nevertheless, it is helpful to examine briefly the areas of disagreement.

First, the parties disagree about what Vinson actually told Kennedy about her former episode of depression. According to Vinson, she told Kennedy that she had been diagnosed by a psychiatrist as having severe depression, that she was suicidal and that she required psychiatric treatment to recover. Vinson Dep. at 47–48, 50, 108. The defendant counters that Vinson only told Kennedy "she had taken some anti-depressant medication some years before." Kennedy Aff. ¶ 33. This dispute is not material because the proper focus is on whether Kennedy regarded Vinson as having a mental impairment that significantly restricted her ability to perform her job duties during the period that Kennedy supervised Vinson. Kennedy does not recall Vinson ever telling her she had been diagnosed with depression, and she was not aware of Vinson ever having a psychological impairment that had interfered with her ability to work. Id. ¶¶ 35, 33. As already noted, the only evidence Vinson offers regarding Kennedy's perception of such

a "disability" was that Kennedy frequently suggested Vinson get counseling at Solutions. Vinson admits, however, that Solutions did not have psychiatrists and it would not be where a person would go for psychiatric treatment. Vinson Dep. at 160. Thus, even a recommendation that she go to Solutions would not imply that Kennedy thought Vinson had a serious mental impairment and was in need of psychiatric care. At most, it reveals Kennedy's perception that Vinson was under emotional strain.

Another dispute revolves around whether Kennedy "continuously suggested" that Vinson get counseling. Kennedy only recalls one instance in which she suggested counseling, and that was when Vinson had suffered a possible miscarriage. Kennedy Aff. ¶ 35. Vinson claims that the suggestions occurred twice a month during Kennedy's second management period. Vinson Dep. at 53–55, 60, 135. By Vinson's own admission, this second period of management was only seven months long, from May to December of 1994. Vinson Dep. Ex. 7. She has also admitted that Kennedy made no other suggestions about counseling after Vinson's September 1, 1994, mid-year evaluation discussion, at which Vinson had cried. Vinson Dep. at 194. Consequently, the suggestions could only have occurred between May and September 1, 1994, a period of three or four months. The Court does not find that this constitutes any sort of constant or pervasive activity.

Even if such a finding were warranted, there is no evidence that Kennedy's suggestions meant she regarded Vinson as being substantially limited at work as a result of needing counseling, or as being significantly restricted as to the condition, manner or duration under which she can perform a particular major life activity as compared to the average person. See Vinson Dep. at 135–36 (admitting that Kennedy never suggested that Vinson's performance was affected by having depression or that Vinson reacted emotionally at times because of depression). Vinson affirmatively contends that her emotional condition did not affect her work at Cummins. Vinson Dep. at 136, 172. Without evidence to show that Kennedy considered Vinson to be substantially limited in her

ability to work. Vinson fails to raise a genuine issue of material fact about whether she was regarded as having a disability as defined by the ADA.

Also disputed is the issue of when Cummins changed its rating scale. Vinson appears to consider this a material issue because a rating of "three" on the old scale meant she was meeting her employer's expectations, while a three on the new scale meant she was not. At one point, Vinson said she only recalled getting three's on her evaluations. Vinson Dep. at 109. At another point, however, she admitted that her 1994 evaluation was "below average," which is not a "three" out of "five." Vinson Dep. at 129–30. Not only has Vinson failed to produce sufficient evidence to create a factual dispute regarding this issue, she has contradicted her own testimony. At most Vinson's testimony reveals that she is uncertain about when the scale changed, and that she "thought" she received a three out of five in 1993. Vinson Dep. at 114. As noted, there can be no dispute about whether her 1994 rating was deficient, she has admitted it was. *Id.* at 129–30. For that score to be a "three," the one to three scale must have been in place.

According to Gulden, the rating scale changed when he decided to review the entire organization and weed out poor performers. Gulden Aff. ¶¶ 5–6. Vinson has presented no evidence to contradict this testimony, or that of Kennedy, who stated that Vinson's 1992, 1993 and 1994 numerical ratings were all based on a scale of one to three. Her uncertainty about when the scale changed, and the fact that she "thought" her 1993 and 1994 ratings were based on a five point scale, cannot overcome the testimony of the corporate vice president in charge of her department, who was in a much better position to know. Nor can it overcome the testimony of one of the managers whose job it was to apply the scale to rank employees under her supervision. Both of these witnesses were privy to management information that Vinson had no reason to know. Vinson has failed to create a genuine dispute regarding this factual issue. Even if she had, it would not be material because she admitted to having been placed on a perfor-

mance improvement plan and to getting a "below average" rating in 1994. Those two facts alone would be enough for her to be at risk of losing her job during a RIF.

In a related matter, there appears to be a dispute over when Vinson was given the performance correction plan. She says it was sometime between May and December of 1994, while Kennedy contends it was in early 1994, right after she gave Vinson the 1993 evaluation that rated her in the bottom 10% of all employees in the department. Vinson Dep. at 120, 124–25; Kennedy Aff. ¶¶ 16, 19–20. Regardless of when it happened, Vinson does not deny receiving a performance correction plan. Moreover, the 1994 mid-year evaluation, given to Vinson on September 1, 1994, indicated that the plan had already been given to Vinson earlier in the year and that a copy was attached. Vinson offers no evidence other than her own imprecise testimony to counter this documentary proof, and she has thus failed to raise a genuine issue of material fact about when she was given the plan. Again, even if a factual issue existed, it would not be material because Vinson does not dispute that she was placed on a plan to improve her performance during 1994.

The decision to terminate Vinson was made by Gulden, who did so with reference to her written evaluations, as well as his own observations and those of other managers. Gulden Aff. ¶ 4. However, it is undisputed that Gulden would have been aware of the 1994 performance improvement plan and that fact that it was followed by a "below average" annual evaluation for 1994. Gulden could have reasonably relied on the information provided by both of these documents, as well as honestly believed in their accuracy, when determining whether to terminate Vinson. She has offered no proof that Gulden had any reason to doubt the reliability of this documentary information about her performance. Nor does she have evidence that Gulden regarded her as having a disability as defined by the ADA. Because it was his decision that was conveyed to her in the exit interview with Kennedy, Vinson must have some evidence to connect any alleged perceptions and prejudices about her disability status to Gulden. *See Chiaramonte v. Fashion*

*Bed Group, Inc.,* 129 F.3d 391, 397 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998) (actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination). She has presented nothing but speculation.

Vinson claims that because Kennedy did not give her a reason for her termination, and particularly did not tell her about any RIF, this alleged legitimate reason for her termination is nothing but a pretext for discrimination. Plf's Resp. at 21, n. 2. She argues that Cummins's current explanation about what happened is different from the explanation given to her at the time she was fired. According to Vinson, during her termination meeting Kennedy merely told her that "there was no need to rehash it, that everything was spelled out in the review. . . ." Vinson Dep. at 145. This explanation for why she was selected does not contradict the subsequent fuller explanation that she was terminated as part of a RIF. With either explanation, the core reason was her relatively poor performance in comparison with other programmers. Kennedy stated that she did not give any additional detail to Vinson because she had been told by the Human Resources Department not to debate the reasons for a termination during a termination meeting. Kennedy Aff. ¶ 32. Vinson admits that she was unaware of any corporate rules against discussing specific reasons for a termination decision during a termination meeting. *Id.* at 146.

The Court finds that this expressed policy of not discussing the particulars of a termination during a termination meeting adequately explains why Vinson was not told about the RIF and her relative ranking in comparison to other programmers. She has offered no evidence to contradict Kennedy's testimony about the corporate policy and thus has failed to create a genuine issue with respect to the superficially different explanations for termination. Likewise, the fuller explanation cannot be discredited by Vinson's speculation, with no evidence to negate any of Gulden's statements about what was going on at Cummins at the time. In fact, Vinson was not in a position to have personal knowledge of any of the facts about the organization review process or RIF to which Gulden testified. Consequently, her testimony alone cannot overcome the defendant's evidence on this issue. Further, there is no evidence to contradict the fact that a total of twelve people from Vinson's department were involuntarily separated from their positions between June and December of 1995. Gulden Aff. ¶ 12. Nor is there any evidence to dispute the fact that Cummins's president had directed a reduction in force, or to cast any doubt on the neutrality of the decision-making process Gulden used.

Vinson does not dispute that Gulden was the decision-maker with respect to her termination. She has offered no evidence that he knew anything about any past experience she had with depression. Both Gulden and Kennedy have testified that they did not consult with each other regarding the decision to terminate Vinson. Kennedy Aff. ¶ 30; Gulden Aff. ¶¶ 14–15. Gulden's reliance on Vinson's performance evaluations and what he had been told by Kennedy and others about her performance is sufficient to show that he honestly held his belief that Vinson was one of the weaker employees in her department. Thus, even if the Court were to find that Kennedy regarded Vinson as disabled, it has no reason to find that Kennedy's perception affected or motivated Gulden's decision to terminate Vinson.

Finally, several other factual disputes all relate to the same issue of proof. That is, whether Kennedy's evaluations of Vinson's performance were in fact accurate. Vinson has spent a great deal of time on these issues in her brief, so the Court will address them here. However, the Court has already found that Vinson has failed to directly link a perception by Kennedy that she was substantially limited in her ability to work with Kennedy's negative reviews of Vinson's performance. It has likewise found no link between Kennedy's alleged perception of Vinson as disabled and Gulden's decision to terminate Vinson, except for the evaluations on which he relied. Thus, for these factual disputes to cast doubt on Kennedy's evaluations of Vinson's

work, and a shadow on the process of selecting Vinson for termination, they must support a finding that there is no basis in fact for the negative evaluations. *See Sirvidas,* 60 F.3d at 378 ("general averments of adequate performance by [a plaintiff or co-worker] are ordinarily insufficient to create a factual issue"). As the Seventh Circuit has noted, "an opportunity for rebuttal is not an invitation to criticize an employer's evaluation process or simply to question its conclusions about the quality of an employee's performance." *Kariotis,* 131 F.3d at 677.

Without a doubt, Vinson does not agree with Kennedy's evaluations of her performance during 1993 and 1994. According to Vinson, it was her managers that prioritized her work, so any problems with her priorities were not her fault. Vinson Dep. at 77–78. In addition, Vinson states that Kennedy kept pulling her off of one project and having her work on another, so Vinson sees it as disingenuous of Kennedy to subsequently criticize her for not completing projects on time. Vinson Dep. at 70–71. Moreover, she argues that Kennedy knew the reasons for Vinson's projects being late, and that they were not Vinson's fault. Vinson Dep. at 74–75. In a similar vein, Vinson claims that she complied with Kennedy's requests for her to reduce the time spent on the UK project and the corresponding long distance calls, and that she followed Kennedy's directions "as best she could." Vinson Dep. at 77–78. According to Vinson, she followed the performance correction plan and achieved the goals set for her, as noted in the written "rebuttal" she submitted after her 1994 annual evaluation.

■ The mere fact that an employee disagrees with her employer's assessment of her performance does not create a genuine issue of material fact about the genuineness of the employer's perceptions. *See Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994). Neither will general denials of fault for the performance failures attributed to the employee call the employer's decision into question. *Id.* (citing *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124–25 (7th Cir.1994)). Only by addressing the specific performance deficiencies identi-

fied by the employer, such as by refuting facts that allegedly support the employer's claim of performance deficiencies, can the employee create a factual issue. *Id.*

Here, Vinson merely provides general assertions of satisfactory performance and excuses for why projects were late and her supervisor's instructions were not followed. For example, Vinson does not deny missing a target date for a certain project, but claims it was missed because she was "taken off" the project by "management." Vinson Dep. at 71. This explanation does not address the criticism by Kennedy that Vinson is responsible for prioritizing her time, that she did not manage it well, and that she often "spent time working on non-essential customer requests rather than higher priority projects" on which Kennedy had asked her to work. Kennedy Aff. ¶ 17. Vinson's general excuse for why she missed target dates does not rebut the specific criticism stated by her supervisor.

■ In addition, Vinson points to a "long list" of "customers" who were very happy with her work. Vinson Dep. at 143. In the lexicon of programmers at Cummins, customers were the other employees throughout the corporation who used the computer systems the CMS department designed, installed and maintained. However, those customers were not the only ones Vinson had to please, as she was frequently told in her evaluations. Kennedy stated that she interpreted the positive customer comments as reflecting the fact that Vinson had difficulty allocating her time correctly and spent too much time on non-essential requests from customers. A supervisor is entitled to determine that deficiencies in performance outweigh complements from co-workers. *See Fortier v. Ameritech Mobile Comm., Inc.,* 161 F.3d 1106, 1114 (7th Cir.1998). By providing Vinson feedback in her 1992, 1993 and 1994 evaluations about this time management and prioritization problem, Kennedy attempted to let Vinson know that it was Vinson's responsibility to watch the calendar and make sure her projects were completed on time, not her manager's.

Vinson states that she did reduce her hours spent on the UK liaison role and her

long distance calls. What the undisputed facts demonstrate, however, is that Vinson did not reduce them enough to suit her boss. It is obvious that Vinson did not make enough of the changes that her manager considered important, given that the same criticisms appeared in the 1992, 1993 and 1994 evaluations, as well as in the performance improvement plan. At no point does Vinson address the criticism for not doing enough to become more familiar with and learn newer technologies. Gulden had specifically expressed his concern about the number of employees in Vinson's department who were not keeping up with newer technologies. Aff ¶ 4. This reinforces the importance of this criticism of Vinson's performance to Cummins. She has not created any factual issue with respect to this aspect of her negative performance evaluations.

Finally, Kennedy stated in the 1994 review that Vinson required more management time than other programmers. Vinson does not agree with that assessment. Yet, her own testimony indicates that she constantly looked to management for direction on her priorities, expected her manager to know the status of all of her projects, and to tell her if she was not spending her time wisely. This testimony supports Kennedy's criticism regarding how much supervision Vinson needed. In addition, Vinson's mere disagreement, without more, does not indicate that this assessment of her was a lie or an exaggeration. Vinson has failed to create a genuine issue of material fact with respect to the specific criticisms given of her performance, and on which Kennedy based the lower performance ratings in 1993 and 1994. Thus, she cannot call the accuracy of her evaluations into doubt or create the suggestion that Gulden's decision to terminate her was tainted by inaccurate and biased appraisals.

### IV. CONCLUSION

The Court has found that plaintiff Vinson was not regarded by her employer as a person with a disability and as a result she was not protected by the anti-discrimination provisions of the ADA. Because of that finding, the Court also found that Vinson was not terminated because of a disability or being perceived as having a disability. Vinson has failed to present sufficient evidence from which to find a genuine issue of any material facts for trial in this matter. Thus, the motion for summary judgment filed by Cummins is **GRANTED.**