Danny J. HAWKINS, Plaintiff,

v.

The TRUSTEES OF INDIANA UNIVERSITY, Defendant.

No. IP 97–1776–C–M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 3, 1999.

Michael K. Sutherlin, Sutherlin & Betz, Indianapolis, IN, for Plaintiff.

Robert P. Johnstone, Barnes & Thornburg, Indianapolis, IN, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

Defendants, The Trustees of Indiana University ("IU Trustees"), seek summary judgment on the claims against them brought by former employee Danny J. Hawkins ("Hawkins") under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a) (prohibiting discrimination against a qualified individual with a disability because of that disability), and under state contract law. Hawkins alleges that he was terminated from his position at Indiana University ("IU") because he was disabled, he had a record of being disabled and he was regarded as having a disability. *See* 42 U.S.C. § 12012(2). The IU Trustees assert that Hawkins was terminated because he purposefully punched another employee. For the reasons explained below, the Court **GRANTS** the defendants' motion for summary judgment on the ADA claim and **DISMISSES** without prejudice the plaintiff's claim under state contract law.

## I. FACTUAL & PROCEDURAL BACKGROUND

IU's campus in Bloomington, Indiana has a physical plant that employs workers in various trades who maintain and repair the various buildings on its campus. Hewetson Dep. at 21–22. The physical plant is comprised of several divisions including building maintenance and building ser-

vices. *Id.* at 22. Employees in building maintenance repair and renovate buildings and are divided by craft. *Id.* at 24. Building services is the custodial branch. *Id.* Hank Hewetson ("Hewetson"), Associate Director of physical plant, manages both of these divisions. *Id.* at 22.

The plaintiff, Danny Hawkins, began working for IU as a custodian in 1990. Hawkins Dep. Vol. I at 30. In 1992 Hawkins started a four year apprentice program to become a journeyman electrician at IU's physical plant. *Id.* at 33. Hawkins completed the training program in due course and became a journeyman electrician in 1997. Wetzel Dep. at 11.

Foreman Robert Wetzel ("Wetzel") acted as Hawkins' supervisor during his employment as both an apprentice and journeyman electrician. Wetzel Dep. at 10–11, 20. Although IU does not have a formal evaluation process, Hewetson Dep. at 45–46, Wetzel considered Hawkins a competent worker who discharged his responsibilities as an electrician. Wetzel Dep. at 11–12. Some of Mr. Hawkins' coworkers complained to Wetzel about Hawkins' "on-the-job attitude." *Id.* at 12. Specifically, Wetzel received a complaint about Hawkins taking it wrong when a coworker yelled at Hawkins from a position in the attic of a building, or up high in a building when Hawkins was below. *Id.* Wetzel also received a complaint from a Hawkins' coworker that Hawkins yelled at the coworker for carrying tools incorrectly. *Id.* at 13. Neither Wetzel's manager, Robert Breeden ("Breeden"), Manager of Building Maintenance, nor Breeden's manager, Hewetson, had complaints about Hawkins' work performance. Breeden Dep. at 100; Hewetson Dep. at 108. Breeden did state that Hawkins needed help controlling his temper. Breeden Dep. at 90–91.

Hawkins considered himself an excellent employee who was hard working, effective and competent. Hawkins Dep. Vol. I at 128–29. Jim Voliva ("Voliva"), a coworker of Hawkins', described Hawkins as an asset to IU and someone he could trust on the job. Voliva Dep. at 132. In addition to his regular job responsibilities, Hawkins served as his department's union steward and appeared at grievance hearings. Breeden Dep. at 57; Hawkins Dep. Vol. I at 54, Vol. II at 57–59; Voliva Dep. at 5–6, 92–93.

On May 15, 1997, the incident giving rise to this lawsuit occurred. Hewetson Dep. at 60–61; Hawkins Dep. Vol. I at 80; Voliva Dep. at 69. Hawkins was standing at a table where employees in the physical plant filled out time cards when Voliva poked Hawkins in the ribs. Hawkins Dep. Vol. I at 81. Apparently, this was some sort of greeting. Breeden Dep. at 44; Hewetson Dep. at 63; Voliva Dep. at 78. Hawkins responded verbally to Voliva. Hawkins Dep. Vol. I at 81. Voliva then hit or tapped Hawkins on the back of the head. *Id.;* Voliva Dep. at 77, 79. More words were exchanged between the two, Hawkins Dep. Vol. I at 81–82, and then Hawkins punched Voliva in the face. *Id.* at 82; Voliva Dep. at 81–83. Voliva received a bloody nose. Hawkins Dep. Vol. I at 80–83; Voliva Dep. at 91; Wetzel Dep. at 35–36. Even more words were exchanged between the two. Hawkins Dep. Vol. I at 82; Voliva Dep. at 84; Wetzel Dep. at 35–37. Wetzel intervened and asked the two men to accompany him to Breeden's office. Hawkins Dep. Vol. I at 82; Voliva Dep. at 88–89; Wetzel Dep. at 37–38.

Once Wetzel, Hawkins and Voliva were in Breeden's office, Breeden asked the men what happened. Breeden Dep. at 35–37. Voliva related that he had tapped Hawkins on the back of the head as he walked by Hawkins and then Hawkins punched him. Breeden Dep. at 43–44; Hawkins Dep. Vol. I at 83. Hawkins related that he threw the punch as a reflex action to being hit on the head by an unknown person. Breeden Dep. at 44–45; Wetzel Dep. at 40. The parties dispute whether Breeden commented that he could fire the two men for their actions. Breeden Dep. at 49–50; Hawkins Dep. Vol. I at 84–85; Voliva Dep. at 104. Hawkins be-

lieved that Breeden told the men that a written reprimand would be the only punishment each would receive. Hawkins Dep. Vol. I at 84–85, 88–89; Voliva Dep. at 104; Wetzel Dep. at 43. Breeden testified that he told Hawkins and Voliva that a written reprimand would be the least punishment they would receive, but he would delay his decision on the correct discipline until he had further investigated the facts. Breeden Dep. at 49–50. Regardless of what punishment the men thought they would receive, both Hawkins and Voliva were to return the next day in order to find out what Breeden had decided. Breeden Dep. at 49–50; Hawkins Dep. Vol. I at 85; Wetzel Dep. at 43–44. After their meeting with Breeden, Voliva returned to work. Wetzel Dep. at 43–44. Hawkins stopped at the Indiana University Office of Affirmative Action to file a discrimination claim before he went home. Hawkins Dep. Vol. I at 93–94; Hawkins Dep. Vol. II at 166–68; Defs.' Ex. 32.

Hawkins called in sick the day after the incident. Hawkins Dep. Vol. I at 85. He then took a scheduled two week vacation. *Id.* The day following the incident and during the time Hawkins was on vacation, Breeden investigated the fight between Hawkins and Voliva by talking with eye witnesses. Breeden Dep. at 67–73. At the end of the investigation, Breeden and Hewetson decided that Hawkins should be suspended for five days pending termination because he purposefully punched Voliva. Hewetson Dep. at 65–57. Both men felt that purposeful physical violence violated IU's policies. Breeden Dep. at 15–16; Hewetson Dep. at 49, 84. Voliva was given a written warning for inappropriate horseplay. Breeden Dep. at 79–82.

On the day he was to return from vacation, Hawkins called in sick again. *Id.* When Hawkins returned to work, more than two weeks after the incident, he was informed that he would be suspended for five days pending termination. Breeden Dep. at 88. At the end of the five days suspension, Hawkins was to appear again with information that might change the minds of management as to its decision to terminate Hawkins. Breeden Dep. at 88–89; Hawkins Dep. Vol. I at 86, 88. Hawkins did not appear because he did not have any other information to offer. Hawkins Dep. Vol. I at 86–87. Hawkins was terminated on June 9, 1997. Defs.' Ex. 41.

IU has a discipline policy that calls for progressively more serious discipline for each successive infraction. Breeden Dep. at 15; Hewetson Dep. at 53; Wetzel Dep. at 21. The discipline policy is spelled out in a staff handbook distributed by IU to each employee. Pl.'s Ex. 14. IU managers, however, have discretion to skip steps if they feel it is justified under the circumstances. Breeden Dep. at 15–16; Hewetson Dep. at 49–54. The handbook specifically gives managers discretion to skip steps if the problem is serious. Pl.'s Ex. 14.

Hawkins was diagnosed with depression as early as 1989. Hawkins Dep. Vol. I at 230; Pl.'s Ex. 17. He takes Prozac to treat his symptoms of depression. Hawkins Dep. Vol. I at 230; Pl.'s Ex. 17. Hawkins disclosed this fact on his application for employment at IU in 1990. Hawkins Dep. at 154. Hawkins' family physician, Dr. James A. Ray ("Dr.Ray"), currently prescribes Prozac for Hawkins. Hawkins Dep. Vol. I at 124; Ray Dep. at 7, 11. Dr. Ray diagnosed Hawkins with depression using four pieces of information: 1) history given to him by Hawkins; 2) the fact that Hawkins had been taking Prozac; 3) that he had made referrals to psychiatrists for Hawkins in 1993; and 4) Hawkins' report that he had consulted with at least three different psychiatrists before Dr. Ray saw him. Ray Dep. at 17–19. Dr. Ray has never performed a psychiatric evaluation on Hawkins for depression. *Id.* at 18. Dr. Ray's records indicate, however, that Hawkins followed up on a psychiatric referral in January 1994. *Id.* at 20. Dr. Ray had no record of Hawkins' complaints about having trouble at work, having trouble with in-

terpersonal relationships, or having trouble sleeping. *Id.* at 22, 26. Hawkins did not ask Dr. Ray any questions during Dr. Ray's deposition. Ray Dep. at 29.

Hawkins filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 21, 1997, and he received notice that his charge was dismissed on August 2, 1997, along with a right to sue letter. This action was filed, accompanied by a state law breach of contract and promissory estoppel claim on October 31, 1997, just within the ninety-day period for filing suit under the ADA. The Court has jurisdiction over the ADA matter pursuant to 42 U.S.C. §§ 12117, 2000e–5(g) and 28 U.S.C. § 1331. The Court has jurisdiction over the state contract matter pursuant to 28 U.S.C. § 1367, supplemental jurisdiction over state claims arising out of the same event or connected series of events.

The IU Trustees filed a motion for summary judgment on May 6, 1999 asserting there are no genuine issues of material fact on the issues of whether Hawkins was disabled and thus entitled to protection under the ADA, whether IU management's reason for terminating Hawkins, because he punched another employee, was pretext for discrimination, and whether there was a contract between Hawkins and IU. Having reviewed the factual background, the Court now turns to a brief overview of the standards governing its decision.

## II. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could

find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.*, 975 F.2d at 1294.

The summary judgment standard is applied with added rigor in employment discrimination cases because of the crucial role played by motive, intent and credibility in resolving such cases. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir.1999). However, even when discriminatory intent is at issue, the evidence must not only address the issue of intent, but also relate to the specific employment decision in question. *Cowan v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir.1997). Further, the non-movant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir.1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir.1993)).

### B. ADA STANDARDS

■ The ADA prohibits discrimination against, and requires an employer to reasonably accommodate the known limitations of, an otherwise qualified employee with a disability. 42 U.S.C. § 12112(a), (b). Unlawful discrimination against an otherwise qualified employee includes both discriminatory discharge and failure to make a reasonable accommodation. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). Determining which employees are protected by this federal law requires a positive response to two questions. *See Leisen v. City of Shelbyville*, 153 F.3d 805, 807 (7th Cir.1998). First, does the employee have a disability as that term is defined in the act? *See* 42 U.S.C. § 12102(2); *Leisen*, 153 F.3d at 807. Second, is the employee an otherwise qualified individual? *See Leisen*, 153 F.3d at 807. It is the employee's burden to

show that his claim falls within the protection of the ADA. *See Corder v. Lucent Technologies Inc.*, 162 F.3d 924, 927–28 (7th Cir.1998). These two questions correspond to the first two elements of a *prima facie* case.

To meet the first element, an employee may establish, that he:

1. has a physical or mental impairment that substantially limits one or more of his major life activities;

2. has a record of such an impairment; or

3. is being regarded as having such an impairment.

*See* 42 U.S.C. § 12102; *Duda v. Board of Education of Franklin Park Public School Dist. 84*, 133 F.3d 1054, 1058 (7th Cir. 1998). The regulations further explain the meaning of each of these definitions. *See* 29 C.F.R. § 1630.2(g)-(*l*); *Duda*, 133 F.3d at 1058.

■ The second element involves establishing that the employee is a "qualified individual" with a disability. *See Duda*, 133 F.3d at 1058. An employee meets this standard by proving he is able to perform the essential functions of the position he holds or desires, with or without a reasonable accommodation. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996). Only after an employee establishes that he is a qualified individual with a disability may the court turn to the issue of whether the employer terminated him because of the disability. *See Duda*, 133 F.3d at 1059; *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 459 (7th Cir.1997).

■ To further satisfy his *prima facie* case of discrimination under the ADA, a plaintiff must also establish that his work performance met the employer's legitimate expectations, and that the employer terminated him because of his disability. *See White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995); *see also Leffel v. Valley Financial Servs.*, 113 F.3d 787, 793 (7th Cir.), *cert. denied*, 522 U.S. 968, 118

S.Ct. 416, 139 L.Ed.2d 318 (1997). The last element may be proved by showing that "persons not disabled or perceived to be disabled were treated more favorably than the plaintiff . . . ." *Leffel,* 113 F.3d at 793. Although proof of disparate treatment is "one of the most obvious ways to raise an inference of discrimination," it is not the only means. *Id.* at 794. Establishing a *prima facie* case, however, is a necessary predicate to any requirement that the employer justify its actions. *See Bombard,* 92 F.3d at 563.; *White,* 45 F.3d at 361.

■ As with any other employment discrimination suit, a plaintiff may prove his case using either a direct or indirect method of proof. *See Leffel,* 113 F.3d at 793 (citing *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995)). When no direct evidence exists, the plaintiff may point to circumstantial evidence that gives rise to the inference of discrimination. *See id.* Courts examine this evidence using the familiar *McDonnell–Douglas* burden-shifting framework. *See Leffel,* 113 F.3d at 794 (specifically adopting the *McDonnell–Douglas* framework for ADA cases). Within that framework, the first step is the *prima facie* case as just described. *See id.*

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *See id.* Having given that reason, the defendant shifts the burden of production back to the plaintiff, who must show that the proffered reason is really a pretext for discrimination. *See id.* To overcome summary judgment, the plaintiff must come forward with evidence that, if believed, will satisfy each element of the *prima facie* case, and render the defendant's proffered explanation unworthy of credence. *See DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 798 (7th Cir.1995) (citing *Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48

(1994)). To call the defendant's proffered reasons into question, a plaintiff must produce sufficient evidence to show either that there is no basis in fact for the stated reasons, that they are not the real reasons, or that the stated reasons are insufficient to warrant the adverse action. *See Vanasco v. National–Louis Univ.,* 137 F.3d 962, 965 (7th Cir.1998); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994).

## III. DISCUSSION

### A. DISABILITY UNDER THE ADA

■ Hawkins claims that he may invoke the protection of the ADA because his depression disables him as it is defined by each of the three definitions. Specifically, Hawkins asserts that his depression substantially limits his major life activities of working, sleeping, caring for himself and talking and relating to others. He also claims he had a record of such depression, and that the IU Trustees regarded him as having depression that substantially limits his ability to work, interact with coworkers and take care of himself. *See* 42 U.S.C. § 12102(2). The IU Trustees assert that Hawkins has failed to present evidence that he is substantially limited in his major life activities and therefore cannot prove he is disabled under any of the definitions of the ADA. The Court will address each of Hawkins' arguments in turn.

#### 1. Impairment that Substantially Limits Major Life Activities

■ In order to show that a mental impairment substantially limits a major life activity, Hawkins must provide evidence that his depression prohibits him from performing or significantly restricts the condition, manner or duration under which he can perform a major life activity as compared to the general population. *See* 29 C.F.R. § 1630.2(j)(i)-(ii); *Duda v. Board of Education of Franklin Park Public School Dist. 84,* 133 F.3d 1054, 1058 n. 5 (7th Cir.1998). To determine whether an em-

ployee's condition substantially limits his major life activities a court should consider the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact, or the expected impact of the impairment. *See* 29 C.F.R. § 1630.2(j)(2); *Duda,* 133 F.3d at 1058 n. 5 (referring to the factors as regulatory offerings); *Harrington v. Rice Lake Weighing Sys., Inc.,* 122 F.3d 456, 459 (7th Cir.1997) (listing the factors from the regulation). Major life activities include, but are not limited to "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *Duda,* 133 F.3d at 1058 n. 6. A court must evaluate a particular individual's impairment as it is corrected or mitigated by medication or other means. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2146–47, 144 L.Ed.2d 450 (1999). Further, "[t]he use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting." *Id.* 527 U.S. 471, 119 S.Ct. at 2149.

Hawkins takes Prozac to mitigate the effects of his depression. Hawkins Dep. Vol. I at 120. He asserts that even with Prozac, his depression causes him to have difficulty at work, to have difficulty sleeping or to sleep too much, to have periods where he cannot leave his house or get out of bed to care for himself, to have times that he must call into work sick, and to use more energy to concentrate on work than the average person. Hawkins Aff. ¶ 7–8. Moreover, Hawkins claims that he has difficulty interacting with people, which in turn causes him to have problems at work, to have difficulty bargaining for goods, and to have difficulty talking on a CB radio or a telephone. Hawkins Aff. ¶ 7c; M. Hawkins Aff. ¶ 6. Some of Hawkins' allegations amount to a claim that his depressive symptoms substantially limit his ability to work. These allegations will be treated as claims to that effect. Other allegations make separate claims that Hawkins' symptoms substantially limit his ability to sleep or to interact with others. The Court will address those claims separately.

■ To establish a substantial limitation on the ability to work, Hawkins must show that his depression "substantially limit[s] employment generally." *Weiler v. Household Finance Corp.,* 101 F.3d 519, 524 (7th Cir.1996). " '[A]n inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work." *Id.* (quoting *Byrne v. Board of Educ., School of West Allis–West Milwaukee,* 979 F.2d 560, 565 (7th Cir.1992)).

Hawkins argues that his depression substantially limits his ability to work. Specifically, he alleges that he has difficulty concentrating, which causes him to use more energy to be efficient and effective, that he must sleep more in order to maintain his level of concentration and hence his efficiency, and that he has difficulty interacting with other people and is teased as a result, which causes him to have anxiety about going to work. Other than the self-serving affidavits of himself and his wife, Marsha Hawkins ("Marsha"), Hawkins offers no support for these allegations. In fact, the evidence provided by deposition testimony of Hawkins and others reflects little impact of his depression on his work.

Hawkins testified that his depression rarely affected his ability to work and did not significantly affect the number of sick days he took. Hawkins Dep. Vol. I at 149–150. In addition, Hawkins' supervisor testified that he had no problem with Hawkins' work. Wetzel Dep. at 11–12. Nor is there evidence that Hawkins was significantly restricted in the types of jobs available to him at IU. In fact, Hawkins moved from a relatively unskilled position in the custodial group to a more skilled position in the crafts department in 1992, eventually becoming certified as a journeyman

electrician. Hawkins Dep. Vol. I at 16, 30, 33; Wetzel Dep. at 11. These facts belie the conclusory statements in Hawkins' and Marsha's affidavits.

Hawkins asserts that his inability to interact with other people also significantly restricts his working activity. Hawkins states: "I have a limitation that effects [sic] my work performance and my ability to work based upon my interaction with other people." Hawkins Aff. ¶ 7c. Marsha's affidavit reaffirms that Hawkins had trouble at work because of his difficulty relating to people. M. Hawkins Aff. ¶ 4. The evidence, however, suggests that any difficulty Hawkins had relating to people was not significantly limiting. Hawkins himself testified that he was hard working, effective and competent. Hawkins Dep. Vol. I at 128–29. Hawkins cannot now claim, by affidavit, that he in fact was not effective or competent in order to create an issue of material fact. See Piscione, v. Ernst & Young, L.L.P., 171 F.3d 527, 532–33 (7th Cir.1999) (discussing the "well-settled rule" that a court will reject proffers of affidavits to create conflicting facts in order to defeat summary judgment). Moreover, Hawkins himself as well as Wetzel, testified that Hawkins worked with a variety of individuals over a period of five years and only two individuals requested they not be partnered with Hawkins in the future because of a personality conflict. Hawkins Dep. Vol. II at 30–47; Wetzel Dep. at 12–17. Hawkins also represented his peers as a union steward with some success within six months to a year before he was fired. Hawkins Dep. Vol. I at 57–60; Voliva Dep. at 132–33. Presumably, the union steward position required interaction with other people because the union steward filed and supported grievances of union members to management. Breeden Dep. at 57–58.

Hawkins argues that some of Hewetson's testimony about Hawkins' way of dealing with conflict supports a finding that Hawkins had difficulty interacting with people. See Hewetson Dep. at 110, 162–63. Hewetson stated that Hawkins' coworkers reported that Hawkins "apparently had a history of—a difficult time dealing with things that he perceived to be stressful or a problem in his mind." Hewetson Dep. at 110. Hewetson testified that Hawkins had difficulty resolving conflicts himself. Hewetson Dep. at 162. Hawkins would go to an authority figure to resolve them instead. See id. at 163. Hewetson also stated that Hawkins did not "seem to deal with things the way most people would deal with something bothering them ...." Id. Hewetson's testimony about Hawkins' coworkers' statements is inadmissible hearsay. Hearsay is an out-of-court statement offered for the truth of the matter asserted. See Fed.R.Evid. 801(c). The Court will consider only admissible evidence when ruling on a motion for summary judgment. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996). Even so, Hewetson's testimony may raise an inference that Hawkins had trouble dealing with conflict, but there is no suggestion in Hewetson's testimony or elsewhere that Hawkins' tendency to seek management's help in resolving conflicts occurred so frequently that it interfered with Hawkins' ability to work effectively.

The only inference a reasonable fact finder could draw from the evidence of Hawkins' work history is that Hawkins can communicate effectively and competently for a substantial part of a work day, and did so for at least five years while employed at IU. Alternatively, if in fact Hawkins' depression caused any difficulty interacting with people at work, it did not rise to the level of a substantial limitation as required by the ADA, or it would have manifested itself on a continuing basis with successive coworkers.

Hawkins next argues that his depression substantially limits his ability to sleep and that it substantially affects his ability to interact with other people outside of work. Yet he cites no authority for a finding that sleeping or interacting with people outside

of work should be considered major life activities in and of themselves.[1] However, even assuming they are major life activities, Hawkins offers little evidence that his depression substantially limited those major life activities at the time of the incident that resulted in his termination. *See Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir.1996) (stating that a plaintiff must prove he is a "qualified individual" under the ADA at the time of the adverse action by the employer) (quoting 29 C.F.R. app. § 1630.2(m)).

To support his argument that depression substantially limited his sleep, Hawkins provides health records, his own deposition testimony, his own affidavit and the affidavit of his wife, Marsha. The health records indicate that Hawkins complained about his sleep patterns to a doctor in 1992, five years before IU terminated him for punching Voliva. Pl.'s Ex. 17. In contrast, Dr. Ray did not mention sleep difficulties as a basis for his diagnosis of Hawkins' depression. Ray Dep. at 17–19. Nor does Hawkins provide records from Dr. Ray showing he had complained about sleep disruptions. When asked about the typical way he would make a diagnosis of depression, Dr. Ray stated that sleep would be a factor. Ray Dep. at 6. Hawkins suggests that Dr. Ray would not continue prescribing Prozac for Hawkins if Hawkins did not continue to exhibit some of the symptoms associated with depression. Yet he provides no evidence of Dr. Ray's records on this issue, nor did he ask Dr. Ray any questions during his deposition about this or any other issue to corroborate his own statements. Ray Dep. at 29. Moreover, Dr. Ray did testify that he felt Prozac helped Hawkins' depression and that it allowed Hawkins to function

day-to-day. Ray Dep. at 14–17. Presumably, this would include any problems Hawkins had with sleep. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2146–47, 144 L.Ed.2d 450 (1999) (determining that the individualized inquiry mandated by the ADA requires a court to take mitigating measures taken by the individual "into account when judging whether that person is substantially limited in a major life activity ...").

Hawkins himself testified that some of his sleep disturbances were associated with his gastrointestinal reflux problems wholly unrelated to his depression. Hawkins Dep. Vol. I at 149–150. To the extent Hawkins' affidavit contradicts his prior deposition testimony, the deposition testimony prevails. *See Piscione*, 171 F.3d at 532–33. Thus, if Hawkins' depression affected his sleep while he was taking Prozac, it could not have been a permanent or severe problem or Dr. Ray would have testified that Hawkins could not function even on the medication.

Other facts also contradict Hawkins' statements that his depression affected his sleep. Hawkins testified that his depression rarely affected his ability to work and did not significantly affect the number of sick days he took. Hawkins Dep. Vol. I at 149–151; 230–31. In his affidavit, however, he states, "[e]ither I do not sleep or I sleep too much. Sometimes I become lethargic and sleep for two or three days at a time." Hawkins Aff. ¶ 7a. Marsha's affidavit repeats Hawkins' statement as an observation made over ten years of association: "Either [Hawkins] only sleeps two hours or sometimes he stays in bed for two or three days." M. Hawkins Aff. ¶¶ 2, 4. If Hawkins' sleep was substantially limited,

---

1. One court cites an EEOC Enforcement Guidance that implies the EEOC would include sleep as a major life activity. *Stauffer v. Bayer Corp.*, No. 3:96–CV–661RP, 1997 WL 588890, *7 (N.D.Ind. July 21, 1997). Specifically the Guidance states that "[a]n impairment substantially limits an individual's ability to sleep if, due to the impairment, his/her sleep is significantly restricted as compared to the average person in the general population." *Id.* (quoting EEOC Enforcement Guidance: The Americans with Disabilities Act and Psychiatric Disabilities 11 (March 25, 1997)) (emphasis omitted). Another court reports that "[t]he EEOC Compliance Manual does include 'interacting with others' as a major life activity." *Krocka v. Bransfield*, 969 F.Supp. 1073, 1084 n. 8 (N.D.Ill.1997).

as he and his wife imply in their affidavits, Hawkins' prior deposition testimony rings hollow because Hawkins' work would have been affected more than "rarely," and he would have had more than an incidental amount of absences due to sickness. Moreover, a significant number of absences would have been noticed at work, but Hawkins' supervisor testified that he had no problem with Hawkins' work. Wetzel Dep. at 11–12. Again, Hawkins' subsequent affidavit conflicts with his deposition testimony and "the deposition testimony overrides statements made in the affidavit[ ]." *Piscione*, 171 F.3d at 532. As a result, the only possible inference from the deposition testimony by Dr. Ray, Hawkins and Wetzel is that Hawkins' depression was not a substantial limitation on his ability to sleep as compared to the average person.

Further, Hawkins and Marsha both state that Hawkins "sometimes" slept too much. Hawkins Aff. ¶ 7a; M. Hawkins Aff. ¶ 4. "Sometimes" does not qualify as a "substantial limit" or a "significant restriction," a standard that requires something more considerable. *See Sutton*, 527 U.S. 471, 119 S.Ct. at 2150–51 (discussing the meaning of "substantially limits"); *see also* 29 C.F.R. § 1630.2(j)(2) (suggesting that the nature and severity, the duration or expected duration, and the permanent or long term impact of or resulting from the impairment be considered when determine whether an impairment is substantially limiting). None of Hawkins' or Marsha's conclusory allegations amount to proof that Hawkins was experiencing sleep disturbances caused by his depression in May of 1997. In this case, without independent corroboration that Hawkins' depression substantially limited his ability to sleep and therefore his work or other life activities suffered, the Court is unwilling to allow Hawkins' conclusory allegations to create an issue of material fact.

Hawkins supports his allegation that his depression substantially limits his ability to communicate with people using similar self-serving and conclusory affidavit evidence. Additionally, the statements in his affidavit make it clear that the focus of Hawkins' claim here is on his ability to interact with people at work or the effect of his depression on his ability to work effectively. To the extent that Hawkins makes this claim, he is simply repeating his allegation that his depression substantially limits his major life activity of working. As discussed above, the evidence negates such a finding. Hawkins himself testified that he was hard working, effective and competent. Hawkins Dep. Vol. I at 128–29. He cannot now claim, by affidavit, that he in fact was not effective or competent in order to create an issue of material fact. *See Piscione*, 171 F.3d at 532–33. The evidence does not support a finding that Hawkins' depression substantially limits his ability to interact with people at work.

In his brief, supported by Marsha's affidavit, Hawkins tries to broaden to venues other than work his claim that depression substantially limits his ability to interact with people. Marsha states that Hawkins

> has a difficult time talking with other people. For example, when we need to trade, bargain, purchase or sell goods I have to communicate with the people because [Hawkins] cannot handle the simple task of talking and conveying his thoughts. [Hawkins] has difficulty keeping focused and it takes extra energy to remain focused to talk to people. These communications are day to day conversations that [Hawkins] cannot handle. For instance, [Hawkins] used to freely talk on the CB. Now [Hawkins] does not talk on the CB, and more times than not refuses to talk on the telephone.

M. Hawkins Aff. ¶ 6. These allegations are not supported by any other testimony or evidence. More importantly, they do not offer concrete evidence of specific instances over a specific time period, close to or during the time when IU managers terminated Hawkins, for the Court or a fact

finder to draw the necessary inference of a considerable, severe or significant impairment. Further, Hawkins provides no evidence for a causal connection between his depression and his behavior. While it is unfortunate that Hawkins does not bargain with shop keepers or talk freely on the CB, that conduct is not evidence of a debilitating limit in interacting with people that would meet the ADA requirement that an impairment be a significant restriction. *See Sutton*, 527 U.S. 471, 119 S.Ct. at 2150–51 (discussing the meaning of "substantially limits"); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998) (citing the factors set out at 29 C.F.R. § 1630.2(j)(2) to analyze a "significantly limited" claim).

Other evidence submitted in this case also negates the inference that Hawkins has a severe impairment in relating to people. For example, Dr. Ray's testimony included nothing about Hawkins' alleged difficulty in interacting with people, an affliction most people would discuss with their physician if it rose to the level of a substantial limitation. *See* Ray Dep. at 25–26. Additionally, Hawkins' own testimony during his deposition suggested very little, if any, limitation in interacting with people. In what most people consider a rather stressful situation—being questioned under oath by an attorney for an opposing party in a law suit—Hawkins exhibited no apparent difficulty answering questions with long paragraphs of information. *See e.g.* Hawkins Dep. Vol. I at 50–55, 77–89, 95–102; Hawkins Dep. Vol. II at 43–45, 52–53, 80–81, 127–28. Finally, as discussed above, Hawkins worked in the physical plant with a variety of individuals over a period of five years and only two individuals requested they not be partnered with Hawkins in the future. Hawkins Dep. Vol. II at 30–47; Wetzel Dep. at 12–17. He also represented his peers as a union steward at grievance hearings. Hawkins Dep. Vol. I at 57–60; Voliva Dep. at 132–33. A reasonable inference from this evidence is that Hawkins had little difficulty interacting with other people

during a significant portion of his waking day. Self-serving statements that Hawkins had difficulty dealing with people and non-specific allegations of difficulty negotiating with shop keepers and talking on a CB radio cannot negate this inference. Therefore, Hawkins has not made a showing that his depression substantially limited his ability to interact with other people in May of 1997.

**2. Record of a Mental Impairment**

Hawkins must provide evidence that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities" to show he is disabled under the second ADA definition. 29 C.F.R. § 1630.2(k); *see also Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th cir.1998) (discussing the "record of impairment" definition under the ADA). Hawkins argues that he is disabled under the ADA because he had a medical history of depression that IU management knew about and his depression substantially limited his major life activities of working, sleeping, caring for himself and interacting with others.

Hawkins' argument under this definition of disabled fails for the simple reason that he presents no evidence creating an issue of material fact that his depression substantially limited his major life activities. The court in *Davidson* stated that this section may extend the definition of disabled "to those who may require some sort of accommodation from their employer, notwithstanding their inability to demonstrate a present impairment that is substantial enough to qualify as disabling under the ADA." *Davidson*, 133 F.3d at 509 (citing 2 EEOC Compliance Manual ¶ 6887, ¶ 907(a), at 5323).

In *Davidson*, a clinic terminated the employment of a psychotherapist who suffered from Adult Residual Attention Deficit Hyperactivity Disorder ("ADD") in part because of her backlog of dictation. *Id.* at 502. The psychotherapist claimed that the

clinic violated the ADA because it failed to reasonably accommodate her ADD. *See id.* She asserted, among other things, that her ADD was a disability because she had a record of an impairment that substantially limited her ability to learn. *See id.* The woman presented evidence that her ADD imposed obstacles to learning throughout her secondary and post-secondary education. For example, she presented evidence that it took her more time to read and study than her peers and that individualized tutorial assistance and flexible deadlines from teachers and professors allowed her to complete her degrees. *See id.* The psychotherapist also developed techniques that helped her concentrate and improved her retention of material she read. *See id.* These techniques included sitting in the front of the class to avoid distraction, writing out by hand passages she read in textbooks to help her remember and organize the material, and tape recording and transcribing her lecture notes to help commit the concepts to memory. *See id.* at 504–05. The psychotherapist sometimes dropped classes because she fell behind as a result of the extra effort she put into each class. *See id.* at 505. The *Davidson* court held that the psychotherapist had created an issue of material fact on whether she had a record of an impairment that substantially limited her ability to learn. *Id.* at 510. The court reasoned that the psychotherapist had "identified the ways in which her learning-related limitations manifested themselves, as well as the ways in which she compensated for them, with enough specificity that one can reasonably infer that her burdens were distinct from that of the average student." *Id.*

Viewing the facts in a light most favorable to Hawkins, unlike the psychotherapist in *Davidson*, he has not presented sufficiently specific facts that show he had a record of an impairment that rose to the level of a substantial limitation on his major life activities. While Hawkins has presented evidence to show that he had been diagnosed with depression since at least 1989, Hawkins Dep. at 230; Pl.'s Ex. 17, and that his managers may have known before the May 1997 incident that he took Prozac, Hawkins Dep. at 154, he has not presented specific evidence that, in the past, his depression substantially limited his ability to work, to sleep, to interact with other people, or to care for himself.

Briefly, Hawkins has not shown a substantial limit on his ability to work because his supervisor was satisfied with his work as an electrician for five years, Hawkins himself stated he was regarded as a competent worker, and there is no evidence that IU managers prohibited him from working in a class of jobs for any reason. Further, Hawkins moved from a less skilled position in the custodial department to a more skilled position in the craft department in 1992. This move reflects a record of ability not disability. Based on the evidence presented, any sleep disruptions that Hawkins had did not substantially limit his ability to work effectively for the seven years he was employed at IU. In addition, Hawkins had no record of a substantial limit on his ability to interact with people such that it affected his work. In fact, Hawkins testified that his depression affected his work only rarely, which does not rise to the level of a substantial limitation. *See* Hawkins Dep. Vol. I at 138–29.

Any claim that Hawkins' sleep itself, as a separate major life activity, was substantially limited at any time fails because Hawkins' proof on the issue is insufficient to raise an issue of material fact. *See Cliff v. Board of Sch. Comm'rs,* 42 F.3d 403, 408–09 (7th Cir.1994) (discussing the non-moving party's burden to produce non-conclusory evidence to support its position). In Hawkins' medical records there is only one reference to his difficulty sleeping in connection with his depression. *See* Pl.'s Ex. 17. Dr. Ray did state that trouble with sleep is one of the factors used to make a diagnosis of depression, however, that was not one of the symptoms he used in his diagnosis of Hawkins. *See* Ray Dep.

at 17–18. Hawkins did not even ask Dr. Ray to clarify his diagnosis. *See id.* at 17–18, 29. The rest of Hawkins' evidence on sleeping is self-serving and conclusory and will not defeat a motion for summary judgment. *See Cliff,* 42 F.3d at 408.

Likewise, Hawkins' evidence that his depression affects his ability to care for himself lacks depth and substantiality. Hawkins states in his affidavit, "I have some limitations in my ability to care for myself. There are times when I cannot leave my house and during the time that I stay in the house I do not clean myself, change my clothes or eat; I simply just stay in bed." Hawkins Aff. ¶ 7b. Unsupported by any other evidence, this allegation cannot, alone, raise an issue of material fact. *See Cliff,* 42 F.3d at 408.

### 3. Regarded as Having a Substantially Limiting Impairment [2]

Under the ADA Hawkins may show he was regarded as disabled in one of three ways. He may show that his depression does not substantially limit a major life activity, but his depression was treated by IU management as constituting such a limitation. *See Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999) (stating that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities"); *Riemer v. Illinois Dept. of Transportation,* 148 F.3d 800, 806 (7th Cir.1998) (citing 29 C.F.R. § 1630.2(*l*)(1)). Alternatively, he could show that his depression is only substantially limiting because of the attitudes of others toward his depression. *See Harrington v. Rice Lake Weighing Sys., Inc.,* 122 F.3d 456, 459 (7th Cir.1997) (citing 29 C.F.R. § 1630.2(*l*)). Or Hawkins may show that he has no actual impairment, but IU management treated him as if he had a substantially limiting impairment. *Id.*

Hawkins relies on the standards discussed in *Vinson v. Cummins Engine Co.,* 36 F.Supp.2d 1085 (S.D.Ind.1999). "[I]t must be shown that the employer regarded the employee as either unable to care for her or himself or unable to perform all of the duties of his or her job." *Id.* at 1094 (citing *Harrington,* 122 F.3d at 460). Therefore, Hawkins must provide "sufficient evidence to show, or create a factual issue, that [IU] perceived [Hawkins] to be 'significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the average person in the general populations' ability to perform that same major life activity.'" *Id.* (quoting *Riemer,* 148 F.3d at 806; 29 C.F.R. § 1630.2(j)). Thus, Hawkins makes his argument using the first standard described above.

Hawkins asserts that the IU Trustees perceived him as having a disability that substantially limited his ability to work, to interact with others, and to take care of himself. Hawkins again relies on Hewetson's statements about Hawkins' difficulty

---

2. IU objected to the use of documents referred to in this section on the basis of that they are not authenticated and/or contain hearsay or layers of hearsay, and/or irrelevant. Hawkins responded that documents produced during discovery are implicitly authenticated for purposes of summary judgment motions and cites *In re Greenwood Air Crash,* 924 F.Supp. 1511, 1514–15 (S.D.Ind. 1995), as authority for this statement. Hawkins also responded that the statements contained in the documents are either admissions of a party opponent, offered for another purpose such as motive, knowledge or intent, or a record of regularly conducted business activity and therefore admissible under a hearsay exception. *See* Fed. Rules Evid. 801(d)(2), 803(4), 803(5), and 803(6). For purposes of this summary judgment motion, the Court will follow the rationale of *In re Greenwood Air Crash,* that relies on the Seventh Circuits opinion in *Brown,* and find the documents authenticated by production in response to a discovery request accompanied by an attorney's affidavit that those are the documents requested. *See In re Greenwood Air Crash,* 924 F.Supp. at 1514 (citing *United States v. Brown,* 688 F.2d 1112, 1116 (7th Cir.1982)). The Court will only use statements contained in the documents for admissible purposes.

dealing with stressful situations and conflicts at work. *See* Hewetson Dep. at 110, 162–63. Hawkins also argues that his co-workers teased him using the word "psycho," and that management admitted that there was a work culture problem that needed to be addressed. Breeden Dep. at 60–62; 98; Hawkins Dep. Vol. I at 94, 98–99; Hewetson Dep. at 142–45. Hawkins also reported that he remembers either Hewetson or Breeden asking him, "Are you so crazy you can't figure out when to keep your mouth shut?" Hawkins Dep. Vol. I at 169. Further, during the time that Hawkins was a union steward and he was late to a meeting, Hewetson asked him, "Haven't you had your Prozac today? Is that why you're kind of upset, kind of nervous, kind of bugged?" *Id.* at 99. Hawkins simply argues that these statements prove that IU management thought he was substantially limited in his ability to work, relate to others or take care of himself.

Hawkins has provided some evidence to create an inference that IU's management was aware of his depression and that he took Prozac to help diminish its effects. He stops short, however, of presenting evidence that meets the standard at issue. Namely, that in May of 1997, IU management perceived Hawkins to be "significantly restricted" in "the condition, manner or duration under which [he could]" work, interact with people or take care of himself "as compared to the average person." *Riemer*, 148 F.3d at 806. As discussed above, Hawkins' managers at IU had no complaints about his work. Breeden Dep. at 100; Hewetson Dep. at 108; Wetzel Dep. at 11–12. Moreover, Hawkins himself and one of his co-workers testified that Hawkins was perceived as a good worker. Hawkins Dep. at 128–29; Voliva Dep. at 132. Hawkins also worked well with a majority of his peers, Hawkins Dep. Vol. I at 30–47; Wetzel Dep. at 12–17, and successfully obtained certification as a journeyman electrician. Hawkins Dep. Vol. I at 16, 30, 33; Wetzel Dep. at 11. There is no evidence that IU managers held Hawkins back or gave him lesser assignments for any reason, including because they thought he was significantly restricted as to the condition, manner or duration under which he could work.

Hewetson observed that Hawkins dealt with things that bothered him differently than most people. Hewetson Dep. at 163. This statement coupled with the questions asked of Hawkins in two different contexts is simply not enough evidence to create an inference that IU managers perceived Hawkins as unable to care for himself or unable to perform all of the duties assigned to him. Both the statement and the questions reflect management's concern about Hawkins' judgment in dealing with conflict and with knowing when to let a subject drop. However, questionable judgment is not a substantial limitation on Hawkins' ability to work, interact with others, or take care of himself.

Hawkins also provides evidence that in May of 1996, IU's affirmative action department was handling more than one complaint about harassing behavior by workers in the physical plant toward persons on Prozac. Pl.'s Ex. 3. An employee of the affirmative action department wrote in May of 1996 that Greg Fichter ("Fichter"), Assistant Director Physical Plant, openly maintained a negative attitude toward individuals on Prozac. *Id.* In addition, individuals from the affirmative action department met with Gary Kent ("Kent"), Physical Plant Administrator, in June of 1996 to discuss educational awareness for Kent's work group on harassment of people with mental disabilities. Boardman Dep. at 93–94; Pl.'s Ex. 15. Hawkins argues that all of this evidence creates an issue of fact about whether IU's management perceived him as impaired by his depression.

Hawkins' argument is flawed. The evidence presented here supports an inference that IU's management was attempting to address an attitude problem, not that it perceived Hawkins as substantially

limited in a major life activity. That Fichter may have harbored a negative attitude toward persons on Prozac is of no consequence at the time of Hawkins' termination. Although Fichter was responsible in some way for supervising Hawkins in the custodial group, for the five years Hawkins worked in the craft department, Fichter had no responsibility for determining Hawkins' assignments, potential for advancement or anything else connected with Hawkins' work. *See* Hewetson Dep. at 30–41. In fact, the only evidence of any interaction that managers connected with Hawkins had with Fichter was at staff meetings attended by Fichter and Hewetson. *See* Hewetson Dep. at 31. Moreover, Hawkins presents no evidence that links Fichter's alleged attitude and Kent's or Hewetson's awareness of an attitude problem with any negative perception on their part of Hawkins' ability to work, care for himself, or interact with others.

The focus of this ADA definition is on how IU management perceived Hawkins because of his disability. *See Riemer*, 148 F.3d at 806 (discussing the standards under the ADA's third definition of disabled). Hawkins offers no causal connection between these facts and IU management's perception of his ability to do his job, take care of himself, or interact with people. As a result, Hawkins has failed to provide evidence sufficient to raise an issue of material fact that he was regarded by IU management as significantly limited in his major life activities of working, caring for himself, or interacting with others.

The Court recognizes that the facts alleged here by Hawkins may support a claim of hostile environment or harassment if such claim is cognizable under the ADA. *See Silk v. City of Chicago*, 194 F.3d 788 (7th Cir.1999) (assuming that such a cause of action exists under the ADA and remarking that it " 'seem[ed] to arise under the general prohibition against discrimination with respect to terms or conditions of employment contained in 42 U.S.C. § 12112(a)' and in 29 C.F.R. § 1630.4")

(quoting Miranda v. Wisconsin Power & Light Co., 91 F.3d 1011, 1017 (7th Cir. 1996)). But, Hawkins must first provide evidence that he is entitled to protection under the act. He has failed to do so here.

## B. THE CONTRACT CLAIM

 Hawkins filed a state law contract claim against the IU Trustees on a matter somewhat related to his termination of employment. The Court would have jurisdiction over that matter pursuant to the supplemental jurisdiction statute. 28 U.S.C. § 1367. However, the claim by which this Court obtained original jurisdiction, the ADA claim, has been resolved before trial. The Seventh Circuit has stated the general rule that "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir.1998) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1250 (7th Cir.1994)). *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This rule holds true unless unusual circumstances exist. Specifically, "[a] district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims." *Wright*, 29 F.3d at 1251 (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). In this case, the balance of these factors weigh toward dismissal of Hawkins' state law claim without prejudice. While the IU Trustees argue that Hawkins is simply restating his ADA claim as a contract claim, Hawkins asserts that this claim is separate and distinct from his ADA claim. The Court finds that the resolution of the state law contract claim will turn on additional facts and circumstances extraneous to resolution of Hawkins' ADA claim. Further, there is little inconvenience or unfairness for the

parties because both parties reside in Indiana and Hawkins will not lose the opportunity to present his contract claim to a state court if he chooses. For these reasons the Court declines to exercise jurisdiction over Hawkins' state law breach of contract claim.

## IV. CONCLUSION

The Court has found that the plaintiff Hawkins has failed to provide facts that establish that he was substantially limited in a major life activity at the time he was terminated, that he had a record of a substantially limiting impairment, or that IU management regarded him as substantially limited in a major life activity. Therefore, Hawkins has not proved his *prima facie* case of discrimination under the ADA. The Court does not reach the issue of pretext, also raised in the IU Trustees' motion for summary judgment, because the plaintiff has failed to present sufficient evidence from which to find a genuine issue of material fact that he was protected by the anti-discrimination provisions of the ADA. Thus, the IU Trustees' motion for summary judgment on the ADA claim is **GRANTED**. The federal claim from which this Court obtained jurisdiction having been decided before trial, the Court declines to exercise supplemental jurisdiction over the state law contract claim. Thus, the plaintiff Hawkins' state law contract claim is **DISMISSED** without prejudice.